## SAN DIEGO BUILDING TRADES COUNCIL
### ET AL. *v.* GARMON ET AL.

No. 66.    Argued January 20, 1959.—Decided April 20, 1959.

*Charles P. Scully* argued the cause for petitioners. With him on the brief were *Walter Wencke, Mathew Tobriner* and *John C. Stevenson.*

*Marion B. Plant* argued the cause for respondents. With him on the brief was *James W. Archer.*

*J. Albert Woll* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging reversal.

*Solicitor General Rankin,* at the invitation of the Court, 358 U. S. 801, filed a brief for the United States, as *amicus curiae,* urging affirmance.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This case is before us for the second time. The present litigation began with a dispute between the petitioning unions and respondents, co-partners in the business of selling lumber and other materials in California. Respondents began an action in the Superior Court for the County of San Diego, asking for an injunction and damages. Upon hearing, the trial court found the following facts. In March of 1953 the unions sought from respondents an agreement to retain in their employ only those workers who were already members of the unions, or who applied for membership within thirty days. Respondents refused, claiming that none of their employees had shown a desire to join a union, and that, in any event, they could not accept such an arrangement until one of the unions had been designated by the employees as a collective bargaining agent. The unions began at once peacefully to picket the respondents' place of business, and to exert pressure on customers and suppliers in order to persuade them to stop dealing with respondents. The sole purpose of these pressures was to compel execution of the proposed contract. The unions contested this finding, claiming that the only purpose of their activities was to educate the workers and persuade them to become members. On the basis of its findings, the court enjoined the unions from picketing and from the use of other pressures to force an agreement, until one of

them had been properly designated as a collective bargaining agent. The court also awarded $1,000 damages for losses found to have been sustained.

At the time the suit in the state court was started, respondents had begun a representation proceeding before the National Labor Relations Board. The Regional Director declined jurisdiction, presumably because the amount of interstate commerce involved did not meet the Board's monetary standards in taking jurisdiction.

On appeal, the California Supreme Court sustained the judgment of the Superior Court, 45 Cal. 2d 657, 291 P. 2d 1, holding that, since the National Labor Relations Board had declined to exercise its jurisdiction, the California courts had power over the dispute. They further decided that the conduct of the union constituted an unfair labor practice under § 8 (b)(2) of the National Labor Relations Act, and hence was not privileged under California law. As the California court itself later pointed out this decision did not specify what law, state or federal, was the basis of the relief granted. Both state and federal law played a part but, "[a]ny distinction as between those laws was not thoroughly explored." *Garmon* v. *San Diego Bldg. Trades Council,* 49 Cal. 2d 595, 602, 320 P. 2d 473, 477.

We granted certiorari, 351 U. S. 923, and decided the case together with *Guss* v. *Utah Labor Relations Board,* 353 U. S. 1, and *Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc.,* 353 U. S. 20. In those cases, we held that the refusal of the National Labor Relations Board to assert jurisdiction did not leave with the States power over activities they otherwise would be pre-empted from regulating. Both *Guss* and *Fairlawn* involved relief of an equitable nature. In vacating and remanding the judgment of the California court in this case, we pointed out that those cases controlled this one, "in its major aspects." 353 U. S., at 28. However, since it was not clear whether the

judgment for damages would be sustained under California law, we remanded to the state court for consideration of that local law issue. The federal question, namely, whether the National Labor Relations Act precluded California from granting an award for damages arising out of the conduct in question, could not be appropriately decided until the antecedent state law question was decided by the state court.

On remand, the California court, in accordance with our decision in *Guss,* set aside the injunction, but sustained the award of damages. *Garmon* v. *San Diego Bldg. Trades Council,* 49 Cal. 2d 595, 320 P. 2d 473 (three judges dissenting). After deciding that California had jurisdiction to award damages for injuries caused by the union's activities, the California court held that those activities constituted a tort based on an unfair labor practice under state law. In so holding the court relied on general tort provisions of the California Civil Code, §§ 1677, 1708, as well as state enactments dealing specifically with labor relations, Calif. Labor Code, § 923 (1937); *ibid.,* §§ 1115–1118 (1947).

We again granted certiorari, 357 U. S. 925, to determine whether the California court had jurisdiction to award damages arising out of peaceful union activity which it could not enjoin.

The issue is a variant of a familiar theme. It began with *Allen-Bradley* v. *Wisconsin Board,* 315 U. S. 740, was greatly intensified by litigation flowing from the Taft-Hartley Act, and has recurred here in almost a score of cases during the last decade. The comprehensive regulation of industrial relations by Congress, novel federal legislation twenty-five years ago but now an integral part of our economic life, inevitably gave rise to difficult problems of federal-state relations. To be sure, in the abstract these problems came to us as ordinary questions of statutory construction. But they involved a more complicated

and perceptive process than is conveyed by the delusive phrase, "ascertaining the intent of the legislature." Many of these problems probably could not have been, at all events were not, foreseen by the Congress. Others were only dimly perceived and their precise scope only vaguely defined. This Court was called upon to apply a new and complicated legislative scheme, the aims and social policy of which were drawn with broad strokes while the details had to be filled in, to no small extent, by the judicial process. Recently we indicated the task that was thus cast upon this Court in carrying out with fidelity the purposes of Congress, but doing so by giving application to congressional incompletion. What we said in *Weber* v. *Anheuser-Busch, Inc.*, 348 U. S. 468, deserves repetition, because the considerations there outlined guide this day's decision:

> "By the Taft-Hartley Act, Congress did not exhaust the full sweep of legislative power over industrial relations given by the Commerce Clause. Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy judicial exclusion of state action. Such was the situation in *Garner* v. *Teamsters Union, supra*. But as the opinion in that case recalled, the Labor Management Relations Act 'leaves much to the states, though Congress has refrained from telling us how much.' 346 U. S., at 488. This penumbral area can be rendered progressively clear only by the course of litigation." 348 U. S., at 480–481.

The case before us concerns one of the most teasing and frequently litigated areas of industrial relations, the multitude of activities regulated by §§ 7 and 8 of the National Labor Relations Act. 61 Stat. 140, 29 U. S. C. §§ 157, 158. These broad provisions govern both protected "concerted activities" and unfair labor practices. They regulate the vital, economic instruments of the strike and the picket line, and impinge on the clash of the still unsettled claims between employers and labor unions. The extent to which the variegated laws of the several States are displaced by a single, uniform, national rule has been a matter of frequent and recurring concern. As we pointed out the other day, "the statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation." *International Assn. of Machinists* v. *Gonzales,* 356 U. S. 617, 619.

In the area of regulation with which we are here concerned, the process thus described has contracted initial ambiguity and doubt and established guides for judgment by interested parties and certainly guides for decision. We state these principles in full realization that, in the course of a process of tentative, fragmentary illumination carried on over more than a decade during which the writers of opinions almost inevitably, because unconsciously, focus their primary attention on the facts of particular situations, language may have been used or views implied which do not completely harmonize with the clear pattern which the decisions have evolved. But it may safely be claimed that the basis and purport of a long series of adjudications have "translated into concreteness" the consistently applied principles which decide this case.

In determining the extent to which state regulation must yield to subordinating federal authority, we have

been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration. The nature of the judicial process precludes an *ad hoc* inquiry into the special problems of labor-management relations involved in a particular set of occurrences in order to ascertain the precise nature and degree of federal-state conflict there involved, and more particularly what exact mischief such a conflict would cause. Nor is it our business to attempt this. Such determinations inevitably depend upon judgments on the impact of these particular conflicts on the entire scheme of federal labor policy and administration. Our task is confined to dealing with classes of situations. To the National Labor Relations Board and to Congress must be left those precise and closely limited demarcations that can be adequately fashioned only by legislation and administration. We have necessarily been concerned with the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes. But the unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience:

> "Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed pro-

cedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. . . . A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. . . ." *Garner* v. *Teamsters Union,* 346 U. S. 485, 490–491.

Administration is more than a means of regulation; administration is regulation. We have been concerned with conflict in its broadest sense; conflict with a complex and interrelated federal scheme of law, remedy, and administration. Thus, judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted. When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the States from acting.[1] However, due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. See *Interna-*

---

[1] *E. g., Guss* v. *Utah Labor Relations Board,* 353 U. S. 1; *Youngdahl* v. *Rainfair,* 355 U. S. 131; *Teamsters Union* v. *New York, N. H. & H. R. Co.,* 350 U. S. 155; *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468; *Garner* v. *Teamsters Union,* 346 U. S. 485; *Automobile Workers* v. *O'Brien,* 339 U. S. 454; *Amalgamated Assn. of Street, Electric R. & Motor Coach Employees* v. *Wisconsin Board,* 340 U. S. 383; *Hill* v. *Florida,* 325 U. S. 538. See *Teamsters Union* v. *Oliver,* 358 U. S. 283. The cases up to that time are summarized in *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468.

*tional Assn. of Machinists* v. *Gonzales,* 356 U. S. 617.    Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.[2]

When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.    Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations.[3] Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.

At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections.    But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National

---

[2] *United Automobile Workers* v. *Russell,* 356 U. S. 634; *Youngdahl* v. *Rainfair,* 355 U. S. 131; *Auto Workers* v. *Wisconsin Board,* 351 U. S. 266; *United Construction Workers* v. *Laburnum Corp.,* 347 U. S. 656.

[3] See *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468, in which it was pointed out that the state court had relied on a general restraint of trade statute.  Cf. *Auto Workers* v. *Wisconsin Board,* 351 U. S. 266. The case before us involves both tort law of general application and specialized labor relations statutes.  See p. 239, *supra.*

Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board. See, e. g., *Garner* v. *Teamsters Union,* 346 U. S. 485, especially at 489–491; *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468.

The case before us is such a case. The adjudication in California has throughout been based on the assumption that the behavior of the petitioning unions constituted an unfair labor practice. This conclusion was derived by the California courts from the facts as well as from their view of the Act. It is not for us to decide whether the National Labor Relations Board would have, or should have, decided these questions in the same manner. When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

To require the States to yield to the primary jurisdiction of the National Board does not ensure Board adjudication of the status of a disputed activity. If the Board decides, subject to appropriate federal judicial review, that conduct is protected by § 7, or prohibited by § 8, then the matter is at an end, and the States are ousted of all jurisdiction. Or, the Board may decide that an activity is neither protected nor prohibited, and thereby raise the question whether such activity may be regulated by the States.[4] However, the Board may also fail to determine the status of the disputed conduct by declining to assert jurisdiction, or by refusal of the General Counsel to file

---

[4] See *Auto Workers* v. *Wisconsin Board,* 336 U. S. 245. The approach taken in that case, in which the Court undertook for itself to determine the status of the disputed activity, has not been followed in later decisions, and is no longer of general application.

a charge; or by adopting some other disposition which does not define the nature of the activity with unclouded legal significance.   This was the basic problem underlying our decision in *Guss* v. *Utah Labor Relations Board,* 353 U. S. 1.   In that case we held that the failure of the National Labor Relations Board to assume jurisdiction did not leave the States free to regulate activities they would otherwise be precluded from regulating.   It follows that the failure of the Board to define the legal significance under the Act of a particular activity does not give the States the power to act.   In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction. The withdrawal of this narrow area from possible state activity follows from our decisions in *Weber* and *Guss.* The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy.[5]

In the light of these principles the case before us is clear.   Since the National Labor Relations Board has not adjudicated the status of the conduct for which the State of California seeks to give a remedy in damages, and since such activity is arguably within the compass of § 7 or § 8 of the Act, the State's jurisdiction is displaced.

Nor is it significant that California asserted its power to give damages rather than to enjoin what the Board may restrain though it could not compensate.   Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered.

---

[5] "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition . . . ." *Charleston & West. Carolina R. Co.* v. *Varnville Furniture Co.,* 237 U. S. 597, 604.

Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme. See *Garner* v. *Teamsters Union,* 346 U. S. 485, 492–497. It may be that an award of damages in a particular situation will not, in fact, conflict with the active assertion of federal authority. The same may be true of the incidence of a particular state injunction. To sanction either involves a conflict with federal policy in that it involves allowing two law-making sources to govern. In fact, since remedies form an ingredient of any integrated scheme of regulation, to allow the State to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict.

It is true that we have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. *United Automobile Workers* v. *Russell,* 356 U. S. 634; *United Construction Workers* v. *Laburnum Corp.,* 347 U. S. 656. We have also allowed the States to enjoin such conduct. *Youngdahl* v. *Rainfair,* 355 U. S. 131; *Auto Workers* v. *Wisconsin Board,* 351 U. S. 266. State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction. We recognize that the opinion in *United Construction Workers* v. *Laburnum Corp.,* 347 U. S. 656, found support in the fact that the state remedy had no federal counterpart. But that deci-.

sion was determined, as is demonstrated by the question to which review was restricted, by the "type of conduct" involved, *i. e.*, "intimidation and threats of violence."[6] In the present case there is no such compelling state interest.

The judgment below is

*Reversed.*

---

[6] The conduct involved in *Laburnum* was so characterized in *United Automobile Workers* v. *Russell*, 356 U. S. 634, 640, in an opinion by Mr. Justice Burton, who also wrote the opinion of the Court in *Laburnum*. When this very case was before us for the first time we noted that "Laburnum sustained an award of damages under state tort law for violent conduct. We cannot know that the California court would have interpreted its own state law to allow an award of damages in this situation." 353 U. S., at 29.

In *Laburnum* this Court itself expressly phrased its grant of certiorari to include only the limited question of the State's jurisdiction to award damages "[i]n view of the type of conduct found by the Supreme Court of Appeals of Virginia to have been carried out by Petitioners . . . ," 346 U. S. 936, despite the fact that petitioners had urged upon us a question not limited to the particular conduct involved. Petition for certiorari, p. 6.

Throughout, the opinion of the Court makes it clear that the holding in favor of state jurisdiction was limited to a situation involving violence and threats of violence. Thus the findings of the Virginia court as to the flagrant and violent activities of petitioners were set out at length. 347 U. S., at 660–662, n. 4. The Court relies on statements by Senator Taft, the Act's sponsor, and from a Senate Report which point out that "mass-picketing," "violence," "threat[s] of violence," may be a violation of state law, as well as unfair labor practices under the Act. 347 U. S., at 668.

The Court in *Laburnum* points out that it would be inconsistent with the provisions of the Act which allow recovery for damages caused by secondary boycotts, not to allow an injured party "to recover damages caused more directly and flagrantly through such conduct as is before us." 347 U. S. 666. The Court also placed reliance on a quotation from *International Union* v. *Wisconsin Board*, 336 U. S. 245, 253, which points out that the "[p]olicing of . . . conduct . . . ," which consists of "actual or threatened violence to persons or destruction of property," is left to the States. In its concluding

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK, MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, concurring.

I concur in the result upon the narrow ground that the Unions' activities for which the State has awarded damages may fairly be considered protected under the Taft-Hartley Act, and that therefore state action is precluded until the National Labor Relations Board has made a contrary determination respecting such activities. As the Court points out, it makes no difference that the Board has declined to exercise its jurisdiction. See *Guss* v. *Utah Labor Relations Board*, 353 U. S. 1; *Meat Cutters* v. *Fairlawn Meats, Inc.*, 353 U. S. 20; and our earlier opinion in the present case when it was first before us, 353 U. S. 26.

---

paragraph the Court again stresses that Virginia has jurisdiction over "coercion of the type found here . . . ."

The damages awarded were extensive, consisting primarily of loss of profits caused by the disruption of respondents'. business resulting from the violence. These damages were restricted to the "damages directly and proximately caused by wrongful conduct chargeable to the defendants . . ." as defined by the traditional law of torts. *United Construction Workers* v. *Laburnum Corp.*, 194 Va. 872, 887, 75 S. E. 2d 694, 704. Thus there is nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct.

All these factors make it plain that our decision in *Laburnum* rested on the nature of the activities there involved, and the interest of the State in regulating them. The case has been so interpreted in later decisions of this Court. See *Weber* v. *Anheuser-Busch*, 348 U. S. 468, 477; and the phrases quoted from *Russell, supra*. In *Russell* we again allowed the State to award damages for injuries caused by "mass picketing and threats of violence . . . ," 356 U. S., at 638. That opinion also continually stresses the violent nature of the conduct and limits its decision to the "kind of tortious conduct" there involved. 356 U. S., at 646. See also 356 U. S., at 642; and 356 U. S., at 640, where the Court points out that Alabama could have enjoined the activities of the union.

Were nothing more than this particular case involved, I would be content to rest my concurrence at this point without more. But as today's decision will stand as a landmark in future "pre-emption" cases in the labor field, I feel justified in particularizing why I cannot join the Court's opinion.

If it were clear that the Unions' conduct here was unprotected activity under Taft-Hartley, I think that *United Constr. Workers* v. *Laburnum Constr. Corp.,* 347 U. S. 656, and *Automobile Workers* v. *Russell,* 356 U. S. 634, would require that the California judgment be sustained, even though such conduct might be deemed to be federally prohibited. In both these cases state tort damage judgments against unions were upheld in respect of conduct which this Court assumed was prohibited activity under the Federal Labor Act. The Court now says, however, that those decisions are not applicable here because they were premised on violence, which the States could also have enjoined, *Automobile Workers* v. *Wisconsin Board,* 351 U. S. 266, whereas in this case the Unions' acts were peaceful. In this I think the Court mistaken.

The threshold question in every labor pre-emption case is whether the conduct with respect to which a State has sought to act is, or may fairly be regarded as, federally protected activity. Because conflict is the touchstone of pre-emption, such activity is obviously beyond the reach of all state power. *Hill* v. *Florida,* 325 U. S. 538; *Automobile Workers* v. *O'Brien,* 339 U. S. 454; *Motor Coach Employees* v. *Wisconsin Board,* 340 U. S. 383. That threshold question was squarely faced in the *Russell* case, where the Court, at page 640, said: "At the outset, we note that the union's activity in this case clearly was not protected by federal law." The same question was, in my view, necessarily faced in *Laburnum.*

In both cases it was possible to decide that question without prior reference to the National Labor Relations

Board because the union conduct involved was violent, and as such was of course not protected by the federal Act. Thus in *Laburnum,* the pre-emption issue was limited to the "type of conduct" before the Court. 347 U. S., at 658. Similarly in *Russell,* which was decided on *Laburnum* principles, the Court stated that the union's activity "clearly was not protected," and immediately went on to say (citing prior "violence" cases[1]) that "the strike was conducted in such a manner that it could have been enjoined" by the State. 356 U. S., at 640. In both instances the Court, in reliance on former "violence" cases involving injunctions,[2] might have gone on to hold, as the Court now in effect says it did, that the state police power was not displaced by the federal Act, and thus disposed of the cases on the ground that state damage awards, like state injunctions, based on violent conduct did not conflict with the federal statute. The Court did not do this, however.

Instead the relevance of violence was manifestly deemed confined to rendering the *Laburnum* and *Russell* activities federally unprotected. So rendered, they could then only have been classified as prohibited or "neither protected nor prohibited." If the latter, state jurisdiction was beyond challenge. *Automobile Workers* v. *Wisconsin Board,* 336 U. S. 245.[3] Conversely, if the activities could have been considered prohibited, primary decision by the Board would have been necessary, if state damage awards were inconsistent with federal prohibitions. *Garner* v. *Teamsters Union,* 346 U. S. 485. To determine the need for initial reference to the Board, the Court assumed that the activities were unfair labor practices prohibited by the

---

[1] *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131; *Automobile Workers* v. *Wisconsin Board,* 351 U. S. 266.

[2] See *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740; cases cited at Note 1, *supra.*

[3] See text at pp. 253–254, *infra.*

federal Act. *Laburnum, supra,* at 660–663; *Russell, supra,* at 641. It then considered the possibility of conflict and held that the state damage remedies were not pre-empted because the federal Act afforded no remedy at all for the past conduct involved in *Laburnum,* and less than full redress for that involved in *Russell.* The essence of the Court's holding, which made resort to primary jurisdiction unnecessary, is contained in the following passage from the opinion in *Laburnum, supra,* at 665 (also quoted in *Russell, supra,* at 644):

> "To the extent that Congress prescribed preventive procedure against unfair labor practices, that case [*Garner* v. *Teamsters Union, supra,*] recognized that the Act excluded conflicting state procedure to the same end. To the extent, however, that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated. The care we took in the *Garner* case to demonstrate the existing conflict between state and federal administrative remedies in that case was, itself, a recognition that if no conflict had existed, the state procedure would have survived."

Until today this holding of *Laburnum* has been recognized by subsequent cases. See *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468, 477; *Automobile Workers* v. *Russell, supra,* at 640, 641, 644; *International Assn. of Machinists* v. *Gonzales,* 356 U. S. 617, 621, similarly characterizing *Russell;* see also the dissenting opinion in *Gonzales,* especially at 624–626.[4]

---

[4] The same view is taken of *Laburnum* and *Russell* in the *amici* briefs filed in the present case by the Government and the American Federation of Labor and Congress of Industrial Organizations, the latter stating that "[w]e hope to argue in an appropriate case that the *Russell* decision should be overruled."

The Court's opinion in this case cuts deeply into the ability of States to furnish an effective remedy under their own laws for the redress of past nonviolent tortious conduct which is not federally protected, but which may be deemed to be, or is, federally prohibited. Henceforth the States must withhold access to their courts until the National Labor Relations Board has determined that such unprotected conduct is not an unfair labor practice, a course which, because of unavoidable Board delays, may render state redress ineffective. And in instances in which the Board declines to exercise its jurisdiction, the States are entirely deprived of power to afford any relief. Moreover, since the reparation powers of the Board, as we observed in *Russell,* are narrowly circumscribed, those injured by nonviolent conduct will often go remediless even when the Board does accept jurisdiction.

I am, further, at loss to understand, and can find no basis on principle or in past decisions for, the Court's intimation that the States may even be powerless to act when the underlying activities are clearly "neither protected nor prohibited" by the federal Act. Surely that suggestion is foreclosed by *Automobile Workers* v. *Wisconsin Board,* 336 U. S., *supra,*[5] as well as by the approach taken to federal pre-emption in such cases as *Allen-Bradley Local* v. *Wisconsin Board, supra, Bethlehem Steel Co.* v. *New York Board,* 330 U. S. 767, 773, and *Algoma Plywood Co.* v. *Wisconsin Board,* 336 U. S. 301, not to mention *Laburnum* and *Russell* and the primary jurisdiction

---

[5] The Court may be correct in stating that "the approach taken in that case, in which the Court undertook for itself to determine the status of the disputed activity, has not been followed in later decisions, and is no longer of general application." That, however, has nothing to do with the vitality of the holding that there is no pre-emption when the conduct charged is in fact neither protected nor prohibited. To the contrary, that holding has remained fully intact, and, as already noted, underlay the decisions in *Laburnum* and *Russell.*

doctrine itself.[6]   Should what the Court now intimates ever come to pass, then indeed state power to redress wrongful acts in the labor field will be reduced to the vanishing point.

In determining pre-emption in any given labor case, I would adhere to the *Laburnum* and *Russell* distinction between damages and injunctions and to the principle that state power is not precluded where the challenged conduct is neither protected nor prohibited under the federal Act.   Solely because it is fairly debatable whether the conduct here involved is federally protected, I concur in the result of today's decision.

---

[6] If the "neither protected nor prohibited" category were one of pre-emption, there would be no point in referring any injunction case initially to the Board since the pre-emption issue would be plain however the challenged activities might be classified federally.   The same is true of damage cases under the Court's premise of conflict. State power would thus be confined to activities which were violent or of merely peripheral federal concern, see *International Assn. of Machinists* v. *Gonzales,* 356 U. S. 617.