Van Voorhis, J. (concurring).
Invoking the pre-emption doctrine of the United States Supreme Court in labor cases, culminating in San Diego Unions v. Garmon (359 U. S. 236), appellant union asks the court to rule in its favor on the ground that it has violated the law. It has been enjoined from picketing to exert economic pressure on an employer to compel recognition of a different union from the one with which the émployer has a lawful labor contract, The lawfulness of the contract *99 with the other union was confirmed, as we were informed by counsel for both sides upon the reargument, by an election conducted by the National Labor Relations Board at which the employees voted against appellant union and in favor of the union having the labor contract. Such illegal conduct has been held to be subject to restraint by State injunction notwithstanding that the plaintiff is engaged in interstate commerce (Pleasant Val. Packing Co. v. Talarico, 5 N Y 2d 40; Goodwins, Inc., v. Hagedorn, 303 N. Y. 300). Regardless of whether those decisions were overruled in Columbia Broadcasting System v. McDonough (6 N Y 2d 962), as a result of San Diego Unions v. Garmon (supra), or whether Labor Bd. v. Drivers Local Union (Curtis Bros.) (362 U. S. 274) by implication disclaims Federal pre-emption under these circumstances, the 1959 Landrum-Griffin Amendments to the National Labor Relations Act (§ 8, subd. [b], par. [7], added by Labor-Management Reporting and Disclosure Act of 1959, 73 IT. S. Stat. 519 et seq.) specifically render recognitional picketing an unfair labor practice where the employer has lawfully recognized another labor organization. For that reason, under the Federal pre-emption doctrine, I am constrained to the conclusion that appellant union’s contention must have its way that it should be allowed to engage in this disruptive illegal activity for the very reason that the United States Congress has expressly prohibited it. Such is the effect of San Diego Unions v. Garmon (359 U. S. 236, supra).
It is not for us to reason why the States should be deprived of jurisdiction, nor whether doing so is in harmony with established theories of federalism under which States are allowed to proceed where their policies do not contravene Federal policy nor place a burden on interstate commerce.
It should be clearly pointed out, however, that regardless of whether the National Labor Relations Board assumes or declines to exercise jurisdiction to take steps to stop this illegal behavior, the States have been relieved from responsibility in this kind of ease. Appellant union evidently considers that there will be no redress for the employer’s just grievance in the Federal sphere, otherwise it would not be proclaiming the illegality of its conduct as its shield and protection.
Lest there be any assumption that the State courts are shirking responsibility, or uncertainty about the existence or dimen *100 sioixs of this “No Man’s Land” between Fedei-al and State jurisdiction into which we are forbidden to enter, I would call attention to addresses by members of the National Labor Relations Boai'd and of the New York State Labor Relations Board. (Philip Ray Rodgers, Current Problems in the Administration of the Taft-Hartley Act, 1958 Record of Proceedings of Labor Relations Law Sectioix of American Bar Assn., pp. 7-11; Joseph Di Fede, Chairman of New York State Labor Relations Board, Problems of Federal-State Jurisdiction in Labor-Management Disputes, New York University’s Eleventh Annual Conference on Labor, 1958, pp. 85-114.) Chairman Di Fede thus outlined the extent and nature of the “No Man’s Land ” from the State point of view:
“ The extent of the unregulated area cannot be determined precisely, but it is significant, in this regard, that 90 per cent of the business enterprises throughout the country employ less than 20 persons.
* * *
1 ‘ It has been estimated that 25 per cent of the non-agricultural labor forces are employed in businesses over which the national board does not assert jurisdiction (Rosenthal, ' Exclusions of Employees under the Taft-Hartley Act,’ 4 Industrial and L. R. R. 556). The 1958 estimate of the Small Business Administration is that the national board’s jurisdictional standards cover less than 3 per cent of the retail industry in the United States, less than 1 per cent of services and public utilities, and less than 50 per cent of the manufacturers.
‘ ‘ Included in the ' no-man’s land ’ are 126 local transit companies which serve 129 cities with a total population of over 50 million people and the entire hotel industry, over which the national board, with congressional approval, consistently has declined jurisdiction. In the State of New York, for instance, there are some 7,800 hotels and inns employing over 120,000 workers.
“The national board has also refused to assert jurisdiction over taxicab companies. In New York City, alone, there are hundreds of taxicab companies employing over 30,000 drivers. The entertainment and sport industry, operating thousands of nightclubs, vaudeville shows, theatres, baseball parks and clubs, *101 hockey rinks, boxing clnbs, circus exhibitions and race tracks, employing tens of thousands of workers, is another industry over which the national board declines to assert jurisdiction because of the essentially local nature of the activities.” (pp. 91-92).
To this he added (p. 96) that “ The state board, in view of the decision of the Supreme Court, has been compelled to dismiss cases involving franchised automobile dealers, local newspapers, automobile glass distributors, and vending machine companies, even though these companies admittedly failed to meet the national board’s jurisdictional standards.” Concerning this Mr. Di Fede made the following observation (pp. 96-97): “ The foregoing analysis of the extent and nature of the ‘ no-man’s land ’ demonstrates that the extent of this unregulated area is indeed vast. The evils and dangers inherent in the existence of such an unregulated area need no lengthy exposition. The parties to labor disputes in this unregulated area are left without a forum for the peaceful resolution of their disputes. They are necessarily relegated to the use of economic warfare, contrary to both national and state policy. Moreover, the states, which bear the consequences of economic disruption due to strikes and the consequent reduction in production and sales, and which must exercise the obligation of policing such disputes, are left without power to protect the public interest in maintaining industrial peace.”
The problems of the increasing backlog of cases before the National Labor Relations Board, due to this pre-emption doctrine, is vividly and eloquently summarized by Mr. Rodgers (1958 Record of Proceedings of Labor Relations Law Section of American Bar Assn., sufra, p. 11): “ Of this I can assure you: there is a limit — a mental and physical limit—to what any five individuals can do. As this pyramid broadens and these cases multiply, there must inevitably come a point—and in my opinion we are even now rapidly approaching that point —when the personal efforts of five men can achieve no more.” The reasons of the National Labor Relations Board for declining to enforce the Federal law in local situations of the present type are thus made apparent. Mr. Rodgers said, concerning uniformity (pp. 10-11): “ It has at times been facetiously, and yet *102 at the same time wistfully, said that the way for the Board to overcome the backlog is for Board members to affirm the trial examiners without comment, and to sustain the regional directors by telephone. It is true that such actions would cope with the backlog. But they would not represent the type of responsible action which the law contemplates and .the country demands. ’ ’
A further effect of the pre-emption rule is to preclude parties to disputes of this nature—whether they be employers or unions — from maintaining private suits in the courts, and to subject them exclusively to the paternalistic, administrative supervision of a board having the discretion to decide, even if the time and physique of board members could be extended, whether employers or unions should be allowed to resort to the courts through the board for the enforcement of their undoubted legal rights.
The recent amendment to subdivision (a) of section 10 to enable the National Labor Relations Board to cede jurisdiction to such States as have almost identical labor laws appears to have had little effect (Fanning, The “ No-Man’s Land ” and the National Labor Relations Board’s Jurisdictional Policies, 8 Catholic U. L. Rev. [Jan., 1959], pp. 1-12, at p. 10).
These factors, important as they are, can no longer stay the abolition of the powers and responsibilities of the State courts and boards in these matters as a result of the pre-emption doctrine. There should be no misunderstanding that, having been charged with these responsibilities for many years, the State courts and boards are subject to them no longer in the fields which have been described, except in case of activities that are so local in nature as not to come at all within the wide and constantly expanding area of interstate commerce. How long a federalized system can stand this theory of decision may be open to question.
Chief Judge Desmond and Judges Dye, Fuld, Burke and Foster concur with Judge Froessel ; Judge Van Voorhis concurs in a separate opinion.
Upon reargument: Judgment reversed and complaint dismissed, without costs.