MORIAL, Judge.
We reverse.
Any cause of action th.at the petitioner might have under state law has been preempted by federal law because the action complained of arguably falls within the purview of the National Labor Relations Act (NLRA) which is exclusively administered by the National Labor Relations Board (NLRB).
This suit for damages and lost wages was filed on May 15, 1968 as a result of petitioner’s lack of employment between approximately September 27, 1967 until January 8, 1968. The petitioner, Marshall Hinchman, sought damages from Local 130 of the International Brotherhood of Electrical Workers, and the International Brotherhood of Electrical Workers (IBEW) alleging that on September 26, 1968 Earl Sevin the union business agent *820 appeared at the job site and ordered local union members not to work for the plañir tiff, who was a foreman for Curtis Chau-vin Electric Co., contending that he had no authority to hold such a position because he was not a member of Local 130, and only enjoyed “traveler” status within the union. The petition further alleges that as a result of the union’s interference through its business agent, petitioner was forced to stay off the job which resulted in loss of wages of $2,696.43, and in general damages of $10,000. At the time of this alleged interference, Hinchman submitted the matter to the IBEW, and was subsequently reinstated to the job.
The record reveals that Hinchman had been a member in good standing of the IBEW for many years. In 1965, he arrived in St. Charles Parish, Louisiana and registered with Local 130 as a “traveler” because, although he was a member of an IBEW local in Fort Lauderdale, Florida, he was not a member of Local 130. From 1965 until 1967, Hinchman received referrals out of the Local 130 hiring hall, and in 1967 he was referred to Curtis Chauvin Electric Co. where he was immediately made a working foreman by Chauvin. Chauvin’s contract with the IBEW designated Local 130 as exclusive hiring agent, and whenever Chauvin needed a worker, he would notify the hiring hall, and a worker whose name was on one of the hiring hall lists would be referred to the job-site.
Hinchman’s conflict with Local 130 started when he was first referred to Chau-vin and made a working foreman. Evidence exists that even before Hinchman’s discharge, some internal union dissension existed because of his foreman status. The incident which finally precipitated Hinchman’s dismissal occurred when he fired a longstanding member of Local 130 because he allegedly refused to perform any work, though his discharge slip said “character undesirable.” That evening, or some evening soon after, Hinchman met with Alexander, the man he fired, Sevin and another union official. A plan was devised in which Hinchman would go to Baton Rouge until things “cooled down.” The supposed intent of the plan was to keep Alexander from filing charges against Hinchman. For whatever reasons, however, Hinchman decided not to go to Baton Rouge, and returned to work for Chauvin. As soon as the union officials learned that Hinchman was still working, Sevin appeared at the job site claiming that Hinchman did not have a valid referral since he was supposed to be working in Baton Rouge. Sevin demanded that Chau-vin discharge Hinchman, which he did declaring that as soon as he got his “union troubles” straightened out his job would be waiting for him. Even after Hinchman was reinstated, he alleges that both he and Chauvin received continued harassment from the union.
In September of 1968, Hinchman quit his job claiming that union harassment had made it impossible for him to remain, and for the purpose of organizing another local of the IBEW for the river parishes. Hinchman’s application for a IBEW charter was denied on March 4, 1969 and 'a final denial from the IBEW was forthcoming on April 24, 1969. In April of 1969, Hinchman filed a decertification petition with the NLRB seeking to have Local 130 decertified as the exclusive bargaining agent. On June 18, 1969, the decertification petition was dismissed by the NLRB.
On July 17, 1969, however, charges were filed by Local 130 members seeking to have Hinchman expelled from the union for acts disloyal to the union. A hearing was held in which Hinchman refused to participate because he was not allowed to make a statement at the commencement of the hearing. Nevertheless, after some evidence was presented he was convicted of filing a decertification petition and of certain other acts disloyal to the union and expelled. Hinchman appealed this decision to the International Representative of the IBEW before whom a hearing was held on December 6, 1969. Hinchman’s sole argu *821 ment on that appeal was that the hearing was unfair. On January 23, 1970, the International Representative rendered an opinion unfavorable to Hinchman. Hinch-man then appealed to the International Executive Board which dismissed the appeal as not being filed timely. After his dismissal from the union, Hinchman attempted to sign a referral book at the hiring hall, but he was prevented from doing so by the union business agent and therefore essentially denied any employment.
During this period Hinchman became affiliated with the Alliance for Labor Action which was backed by the United Automobile Workers (UAW) and the Teamsters International Union. Having no success with this organization, Hinchman then became affiliated with the Allied Federation of Unions which had a local in Baton Rouge and eventually issued Hinchman a charter to include all crafts, not merely electricians. Hinchman ultimately became business manager of this group, a position he held from late 1970 until late 1971.
The trial of this suit commenced on December 18, 1969 at which time counsel for the defendants Local 130 and IBEW submitted a motion to dismiss for lack of jurisdiction which motion was taken under advisement, and the trial was postponed. The case was subsequently tried on intermittent days commencing on May 5, 1971 and ending on December 14, 1972. On March 5, 1971, Hinchman amended his original petition to include damages for wrongful expulsion, and on March 16, 1972, he again amended his petition to allege that he had been denied due process in the union proceedings which led to his expulsion.
Defendants’ major contention is that the question of jurisdiction should be determined by the test announced by the Supreme Court in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and the cases thereafter: Amalgamated Association of Street, Electric, Railway and Motor Coach Employees of America v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); United Association of Journeymen and Apprentices v. H. N. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1969); International Association of Bridge Structural and Ornamental Ironworkers Union v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963);
Counsel for the plaintiff argues that the applicable rule is enunciated in International Association of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958) in which the Supreme Court found that a state court did have jurisdiction to adjtídicate an expelled member’s claim against the union, and order his reinstatement. We do not agree. The holding in Gonzales has been refined by the cases cited here, and as such Gonzales is not applicable to the case at hand.
In Gonzales, the plaintiff claimed he had been expelled from the union in contravention of its constitution and by-laws, and he brought suit in the state court for restoration of his membership and for damages. In determining that the state court had jurisdiction to award the relief sought, the court interpreted the claim as one in contract, holding that under state law, membership in a union constituted a contract between the member and the union, and as such the California court had the power to award a remedy for breach of that contract. The court found that the NLRA did not preempt the jurisdiction of the state court in this particular case, because Congress had specifically excluded in the NLRA protection for union members from arbitrary union action. The court interpreted § 8(b)(1) of the act which states, “this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein,” to mean that internal union matters were excluded, and that any appropriate state remedy would remain intact. Gonzales, 356 U.S. at 620, 78 S.Ct. at 925. If Gonzales were to stand alone, this court might be com *822 pelled to hold that it did have jurisdiction, but subsequent jurisprudence has indicated that the Gonzales case is to be strictly limited to internal union affairs, and that the States have power to regulate only “where the activity regulated was a merely peripheral concern of the Labor Management Relations Act.” Garmon, 359 U.S. at 243, 79 S.Ct. at 779. We also point out that in Gonzales there was no indication by the court that the petitioner had suffered any additional harassment on the part of the union, or that his employment relationship had been directly interfered with. Here no dispute exists that Local 130 directly interfered with Hinchman’s employment when its business agent refused to allow him to sign an employment referral book as either a “traveler” or “permit.”
Gonzales must be held to be so limited particularly in light of the Supreme Court’s holding a year later in Garmon. In that case, the petitioner, as in this case, sued alleging that the union had committed a tort under state law. In discussing Gonzales and exactly what activities were preempted by §§ 7 and 8 of the NLRA, 61 Stat. 140, 29 U.S.C. §§ 157, 158, 29 U.S.C. A. §§ 157, 158 the court said:
“In determining the extent to which state regulation must yield to subordinating federal authority, we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration. The nature of the judicial process precludes an ad hoc inquiry into the special problems of labor-management relations involved in a particular set of occurrences in order to ascertain the precise nature and degree of federal-state conflict there involved, and more particular- ■ ly what exact mischief such a conflict would cause. Nor is it our business to attempt this. Such determinations inevitably depend upon judgments on the impact of these particular conflicts on the entire scheme of federal labor policy and administration. Our task is confined to dealing with classes of situations. To the National Labor Relations Board and to Congress must be left those precise and closely limited demarcations that can be adequately fashioned only by legislation and administration. We have necessarily been concerned with the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes. But the unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience:
‘Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. * * * A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. * * * ’ Garner v. Teamsters, etc., Union, 346 U.S. 485, 490-491, 74 S.Ct. 161, 165, 98 L.Ed. 228.” 359 U.S. at 241, 79 S.Ct. at 778.

“When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to *823 the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.” 359 U.S. at 245, 79 S.Ct. 780. (emphasis supplied)
Certainly the conduct here complained of is arguably within § 7 or § 8 of the NLRA. 61 Stat. 140, 29 U.S.C. §§ 157, 158, 29 U.S.C.A. §§ 157, 158. The pertinent part of the NLRA is at § 8(b) which states:
“It shall be an unfair labor practice for a labor organization or its agents—
“(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;
“(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * *
Petitioner’s original petition stated that Chauvin’s employees had been instructed not to work for him because he had no authority as a traveler to be a foreman, but in fact it appears that Hinchman was ordered off the job because he refused to cooperate with union officials after the firing of Alexander. In either case, the union caused the employer to discriminate because of union activity, and at the very least this discrimination appears to be proscribed in the above quoted section and, therefore, within the exclusive jurisdiction of the NLRB. After a motion to dismiss was filed, petitioner amended his petition to allege that he had been forced to quit his job because of union harassment, and that he had been wrongfully expelled from the union. At first glance, it appears that this action may fall within the Gonzales rule, but this particular allegation does not stand alone. When taken in conjunction with the allegations of the original petition and all the continual harassment, it is just part of the union’s discrimination in contravention of the above quoted sections of the Act. Furthermore, this expulsion is not merely an internal union matter, and the reasons for the expulsion become important. Not only does the expulsion appear to be part of the prevailing pattern of discrimination, but when petitioner was denied the right to sign a referral book at the union hiring hall and effectively denied employment, the action complained of arguably became an unfair labor practice. At the very least, and consistent with the Louisiana jurisprudence, the NLRB should have had the opportunity to decline jurisdiction before the courts of this state could assert jurisdiction. See Barksdale & LeBlanc v. Local 130 IBEW, 143 So.2d 770 (La.App. 1 Cir. 1962); Toomer v. Local 995 IBEW, 131 So.2d 248 (La.App. 1 Cir. 1961); Derouen v. Lard, 121 So.2d 311 (La.App. 1 Cir. 1960).
The plaintiff’s main argument on appeal appears to be that he -syas denied due process and fairness when he was discharged from the union. Counsel for the petitioner argued orally that this action was exactly the type of action protected by Gonzales, and the subsequent passage of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA). 73 Stat. 523, 29 U.S. C.A. § 411 et seq. In support of his contention that the state court has jurisdiction petitioner cites § 413 of the LMRDA which states:
“Nothing contained in this subchapter shall limit the rights and remedies of any member of a labor organization under State or Federal Law or before any *824 court, or other tribunal, or under the constitution or by-laws of any labor organization.”
While it is true that this section does permit state remedies for wrongful expulsion from a union, it deals only with protection for union members with regard to strictly internal union offenses, and those actions. which would not fall within the National Labor Relations Act. The LMRDA is designed to protect union members from arbitrary and capricious whims of their union leaders, and to insure that members-enjoy within the union itself the-protection afforded by the bill of rights of the Act. LMRDA of 1959, § 101, 29 U.S. C.A. § 411. A member subject to disciplinary action must be “served with written specific charges,” “given a reasonable time to prepare his defense,” and “afforded a full and fair hearing.” LMRDA of 1959, § 101(a)(5), 29 U.S.C.A. § 411(a)(5). The protection of the LMRDA was specifically enacted to afford remedies for conduct not proscribed in the NLRA, and in no way affects the scope of that Act. International Bro. of B., I. S., B., F. & H. v. Hardeman, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971).
Had Hinchman been expelled merely because he voiced disagreement with internal union policy, our decision would necessarily be different. For example, we cite two cases illustrative of the type of action protected by the LMRDA. In Kuebler v. Cleveland Lithographers and Photoengravers Union Local 24-P, 473 F.2d 359 (6 Cir. 1973), the union was held to have violated the members bill of rights when he was disciplined for expressing his dissatisfaction with the way a strike was proceeding. In Schonfeld, AFL-CIO v. Penza, 477 F. 2d 899 (2 Cir. 1973) a union was found to have violated a member’s freedom of speech, and improperly disciplined him with regard to an election dispute. As previously discussed, Hinchman’s discharge was not part of a strictly’ internal union dispute, but was part of the prevailing pattern of discrimination which was arguably within the scope of NLRA and exclusively within the jurisdiction of the NLRB.
Even if Hinchman’s discharge had been exclusively the result of internal union affairs, we doubt that he has a right to any relief. The jurisprudence interpreting the Labor Management Reporting & Disclosure Act (LMRDA) has declared that the interpretation of union rules and by-laws to determine whether particular conduct of a member may result in disciplinary action should be left to the union itself, and their interpretation is not proper for judicial scrutiny. International Bro. of B., I. S., B., F. & H. v. Hardeman, supra. Furthermore, Hinchman was served with written specific charges, allowed reasonable time to prepare his defense and given a full and fair disciplinary hearing during which some evidence was presented against him.
For the foregoing reasons, the judgment of the district court is reversed, and the plaintiff’s suit is ordered dismissed at plaintiff’s costs.
Reversed.
SAMUEL, J., dissents.