Burton S. Sherman, J.
Ms. Lynn Redgrave, a celebrated actress from a distinguished family of the English stage, and Actors Equity Association, an equally eminent American theatrical trade union, are involved in a dispute as to the union’s requirement that an alien actor when appearing in the United States pay higher membership dues than a resident actor. It is said to be a matter of great principle and to have constitutional implications. Since it is a labor grievance it must be heard either before the National Labor Relations Board (San Diego Unions v Garmon, 359 US 236; US Code, tit 29, § 158, subd [b]); the Equal Employment Opportunity Commission (US Code, tit 42, § 2000e-5, subd [f], par [1]) or the Federal courts which have exclusive jurisdiction (Hutchings v United States Inds., 428 F2d 303). However, the hostility and high dudgeon which the dispute has generated has caused one aspect of the controversy, which is not pre-empted by Federal statute, to spill over to this court of limited jurisdiction. Because of this animus, no amount of persuasion could convince these highly principled parties to withdraw this $913.93 claim and proceed to the loftier confines of the Federal establishment, especially when it was pointed out that the outcome of this case will have no bearing on the Federal case. However, a word to the wise!
In any event the case comes before me in the following manner. Ms. Redgrave’s personal management company, Kellybee Enterprises, Inc., brought this action to recover $2,500 which Actors Equity Association (Actors Equity) collected on her behalf from a summer stock theatre. Actors Equity admitted the debt but sought by counterclaim and third-party action to set off $913.93 alleged arrears of Ms. Redgrave’s alien membership union dues. Besides a general denial she counterclaimed for equitable relief, challenging the constitutionality and bias of the union by-laws which provide that resident or alien resident members pay a standard dues of no more than $200 a year while nonimmigrant alien members pay dues of 5% of their salary. Motions for summary judgment and to amend the third-party answer were made after the case was placed on the calendar. It developed at pretrial conference that, although not specifically pleaded, there was one triable issue not pre-empted by Federal law and of which I had subject matter jurisdiction. It was stipulated that this *457 issue and all motions be submitted to me for final determination. The said issue tried was whether Ms. Redgrave’s immigration status had changed to permanent resident alien between January 29, 1975 and January 2, 1976 which would have made the $913.93 assessment based upon nonimmigrant alien membership improper under the union by-laws.
The facts are that Ms. Redgrave, a citizen of Great Britain, first came to this country in 1966 to perform in a Broadway play and joined Actors Equity, which is the exclusive bargaining agent for legitimate stage actors in the United States. From that time, at least until January 29, 1975 she was classified by the Immigration and Naturalization Service (Immigration) as a nonimmigrant alien and held an H-l visa. This is granted to aliens of distinguished merit or ability who temporarily come to the United States to perform services. (US Code, tit 8, § 1101, subd [a], par [15], cl [J].) It is, of course, an immigration category uniquely applicable to foreign actors who visit these shores with an imported play. In 1967 Ms. Redgrave married John Clark, an American citizen, and on January 29, 1975 he filed an application to adjust his wife’s immigration status to permanent resident alien. Upon filing the application she was required to and did surrender her H-l visa. The application was approved on July 1, 1975. However, the immigration regulations required that Ms. Redgrave have a physical examination and appear for a personal interview before any order is issued granting permanent resident alien status. These were completed on January 2, 1976. On that date she received her registration receipt commonly known as a "green card” which indicated that she had become a permanent resident alien. This event received much publicity as Ms. Redgrave was the first British subject to receive permanent resident status in the United States in the Bicentennial Anniversary year. The evidence is inconclusive as to why it took one year to process and finalize the application, nor is it material. However, it appears to have been a combination of slow administrative action and the inability of the applicants to schedule and keep appointments because of a busy out-of-town work schedule. (However, on one occasion there was a bomb scare at immigration headquarters and the interview was postponed.) In any event, in August, 1975 after approval of the application but before the physical examination, personal interview, and issuance of the green card, Ms. Redgrave sought to change her union membership classification. It was *458 her position that she had become a permanent resident alien, on January 29, 1975, and any dues payment or assessment based upon nonimmigrant alien classification after that date should be held in escrow pending the formality of a final order approving her status change to permanent resident alien. If it were disapproved she agreed to pay the assessment as an alien member retroactively.
This proposal was unacceptable to Actors Equity whose position was and still is that membership is adjusted from nonimmigrant alien to resident alien when a green card or other evidence of eligibility is produced showing a change in classification. Although requested in August, 1975, no evidence was furnished by Ms. Redgrave indicating a change in her immigration status until January 2, 1976.
To support her position, Ms. Redgrave argues that according to the immigration law and regulations applicable at that time she was no longer an alien as of January 29, 1975 when her husband’s application was submitted. On that date by surrendering her H-l visa, she claims that she was no longer within the enumerated class of nonimmigrants defined in section 1101 (subd [a], par [15]) of title 8 of the United States Code. Since she was no longer a nonimmigrant alien, subdivision (b) of section 1184 of title 8 of the United States Code creates a presumption that she had become or was an immigrant alien. To further support this she points out that after the application had been filed she was unable to leave the country without obtaining a parole visa which would indicate an immigrant status. She therefore argues that as of January 29, 1975 she was an immigrant alien and a resident by operation of law and her union membership and dues assessments should have been changed on that date to reflect her new status.
Actors Equity argues that the statutory presumption created by subdivision (b) of section 1184 of title 8 of the United States Code is for the purpose of screening aliens for admission and therefore has no application to this case. Furthermore, Matter of Hosseinpour (Bd. of Immigration Appeals, decision No. 2349, 1975, aifd sub nom. Hosseinpour v Immigration & Naturalization Serv., 520 F2d 941) holds that an application to become a permanent resident does not automatically change one’s nonimmigrant alien status. For a change in such status is a matter of administrative discretion and the *459 change is not effectuated until a final order issues. This is evidenced by a "green card”.
The immigration laws and regulations are uniquely designed statutes to control and facilitate foreign entry to this country. Because of the infinite variations of problems involved in migrating, anomalous situations can arise under this law. One such situation arose in this case. For it is obvious from the statutes involved that during the pendency of her application Ms. Redgrave was a nonimmigrant alien for some purposes (Matter of Hosseinpour, supra) and an immigrant alien for others (US Code, tit 8, § 1101, subd [a]; § 1184, subd [b]). Or paradoxically, in the best Gilbert and Sullivan tradition, she simply had no immigration standing at all. This view is both supported by Immigration’s own interpretation of the law, submitted as an exhibit on consent, and the fact that it was necessary for Ms. Redgrave to obtain a parole visa to leave the country during the pendency of the application.
While the temporary "non-person” immigration status had no practical effect on the lives of the parties, it does render immigration law of little value in determining this case. For the by-laws of the union require a definite answer as to immigration status for membership classification purposes. Section 10 of article XI of the by-laws of Actors Equity states: "The term 'Alien’ as used in these by-laws shall be defined as any person admitted to the United States * * * as a non-immigrant alien pursuant to the immigration laws of the United States.”
Section 11 states: "An 'Alien resident’ shall be defined as any alien (immigrant) who has been lawfully admitted for permanent residence to the United States pursuant to the United States Immigration laws.”
There is no dispute that when Ms. Redgrave joined Actors Equity in 1967 she was a nonimmigrant alien member pursuant to section 10 of the by-laws. And there is a presumption in law of a continuance of status. (Perkins v Guaranty Trust Co., 274 NY 250, 259-260.) In view of her anomalous immigration status during the pending application period in question, the presumption of continuance was not overcome until conclusive proof of change was shown. The only conclusive proof of such order granting a change was the green card issued on January 2, 1976. Accordingly, the court holds as a matter of law and fact that pursuant to the by-laws of the union, Ms. Redgrave *460 did not become a nonresident alien member as defined by section 11 of the by-laws until January 2, 1976.
Even if I had the power under CPLR article 78 to review the actions of the council of the union, it cannot be said it acted, as a matter of law, arbitrarily.
Section 8 of article XI of the by-laws states: "The Council shall have full power to define the meaning of this article or any part or any of the wording thereof.”
Section 3 states: "Such alien members as may become eligible, may apply for resident membership. On request for transfer the applicant shall furnish such proof and information as is desired by the Council.”
The policy or procedure of the council to require a green card before transfer of membership is uniformly applied and clearly consistent with the afore-mentioned by-laws. It is designed to provide a manageable classification scheme which is also consistent with the immigration law. For Actors Equity is a labor union not an immigration agency and it cannnot act as a review court or referee to determine the particular status of each pending immigration application with respect to union membership. Accordingly, it cannot be said that the council acted, as a matter of law, unreasonably in this case. While this is so, I feel constrained to comment on certain aspects of this case which I hope may have some effect in settling the ultimate dispute.
There is no denying that one of the main purposes of the differential dues payments is to protect jobs for United States actors. However, in this case, Ms. Redgrave was established in the country long before her husband’s application was filed. No amount of heavy dues assessment would prevent this. In other words no American actor’s job was saved by the action of the Actors Equity in this case.
Secondly, the dues assessment was based upon Ms. Redgrave’s additional earnings in summer stock between June 30, 1975 and August 30, 1975. Not only was this after the application for permanent residence had been approved by Immigration, but also summer stock is an area not customarily available to nonimmigrant alien actors. It would appear that by permitting Ms. Redgrave to engage in such summer work the union recognized, short of a legal waiver or estoppel that she was in fact permanently here.
Nor is there merit to the reciprocity argument. The fact *461 that the English equivalent of Actors Equity has the same double membership standard as exists in this country, does not mean that we must act in a vindictive manner. While England has always been a leading symbol of fair play, perhaps in the area involved in this action, we should take the lead. At pretrial I was led to believe that principle, rather than money was the issue. If this is so, then in the interest of trade union fairness it would appear that this is a classic case where Actors Equity should have acquiesced and canceled the assessment. Particularly when Actors Equity is the exclusive bargaining agent for Ms. Redgrave. Be that as it may, I am constrained to find as a matter of law and fact that the assessment was proper. I find that Kellybee Enterprises, Inc., is entitled to a judgment of $2,500, with interest from September 30, 1975. Actors Equity shall have judgment against Lynn Redgrave in the sum of $913.93, with interest from September 30, 1975 and costs to the prevailing parties.
All motions held in abeyance are decided in accordance with this decision. It is, of course, confined to the issues stipulated to be tried and is without prejudice to any action pending before any Federal agency or the Federal courts.