**MIDWEST MOTOR EXPRESS, INC., Appellant,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL 120, and State of Minnesota, by its Attorney General, Hubert H. Humphrey, III, intervenor, Respondents.**

No. C6–92–1126.

Court of Appeals of Minnesota.

Jan. 19, 1993.

Review Granted March 16, 1993.

Robert S. Halagan, Alec J. Beck, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, for Midwest Motor Express, Inc.,

Stephen D. Gordon, Kathryn M. Engdahl, Gordon–Miller–O'Brien, Minneapolis, for International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 120.

Hubert H. Humphrey, III, Atty. Gen., Scott R. Strand, Asst. Atty. Gen., Michael J. Vanselow, Sp. Asst. Atty. Gen., St. Paul, for State of Minn., by its Attorney General, Hubert H. Humphrey III, intervenor.

Roger A. Peterson, Scott A. Higbee, Peterson, Engberg & Peterson, Minneapolis, for amicus curiae Minnesota AFL–CIO.

Clark C. Griffith, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for amicus curiae Labor Policy Assn.

Brad S. Ervin, St. Paul, for amicus curiae Minnesota Chamber of Commerce.

Considered and decided by HUSPENI, P.J., and SCHUMACHER and AMUNDSON, JJ.

## OPINION

AMUNDSON, Judge.

This appeal arises from the trial court's order granting summary judgment in favor of respondent and intervenor in a declaratory judgment action on the ground that the Minnesota Striker Replacement Act, Minn.Stat. § 179.12(9) (Supp.1991) is constitutional under the Supremacy Clause of the United States Constitution. We affirm and remand.

## FACTS

Appellant Midwest Motor Express (Midwest) is engaged in the business of transportation services. Respondent International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 120 (Union) is the exclusive collective bargaining representative of certain of Midwest's employees. Midwest and the Union are parties to a collective bargaining agreement covering, in part, the bargaining unit employees at Midwest's Roseville, Minnesota facility.

Beginning August 12, 1991, the Union authorized and began a strike at Midwest's facilities in Roseville. The strike resulted from the parties' failure to agree upon terms for a new collective bargaining agreement. The prior agreement between the parties expired on April 1, 1991. The strike had not ended at the time the parties filed their briefs.

This case is the consolidation of two cases arising out of the strike. In the first, Midwest sought injunctive relief from the state court under Minn.Stat. ch. 179 (1990).[1]

1. Midwest commenced this matter on August 14, 1991, when it sought a judgment declaring that the Union violated Minn.Stat. §§ 179.11(6), 179.13, subds. 1 and 2, and 179.11(7). Midwest also sought to enjoin the Union from interfering with the operation of any vehicle or operator in conjunction with the Union's activities at any of Midwest's facilities; interfering with the free and uninterrupted use of public roads; wrongfully obstructing ingress to and egress from any of Midwest's facilities; compelling or attempting to compel any person to join any labor organization or any strike against that person's will by threats, and; engaging in mass picket-

In the second, Midwest sought a declaratory judgment as to whether Minnesota's Striker Replacement Act, Minn.Stat. § 179.12(9) (Supp.1991) is preempted by federal labor law. After the State of Minnesota intervened, the parties stipulated to consolidate the two actions.

Midwest moved for summary judgment, arguing that Minn.Stat. § 179.12(9) is preempted by federal labor law. On February 25, 1992, the trial court denied Midwest's motion and granted summary judgment in favor of the Union and the state. The court determined that federal labor laws do not preempt section 179.12(9) and, therefore, the statute is constitutional under the Supremacy Clause of the United States Constitution. This appeal followed.

### ISSUE

Did the trial court err in determining that federal labor laws do not preempt Minn.Stat. § 179.12(9) (Supp.1991) and therefore, the statute is constitutional under the Supremacy Clause of the United States Constitution?

### ANALYSIS

■ On appeal from summary judgment this court must determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *City of Va. v. Northland Office Properties,* 465 N.W.2d 424, 427 (Minn.App.1991), *pet. for rev. denied* (Minn. Apr. 18, 1991). Since there is no factual dispute, we need only determine whether the trial court correctly applied the law.

Midwest challenges the constitutionality of the Minnesota Striker Replacement Act, Minn.Stat. § 179.12(9) (Supp.1991) (Act) on Supremacy Clause grounds, arguing that the Act is preempted by federal labor law.

The challenged statute makes it an unfair labor practice for an employer:

> To grant or offer to grant the status of permanent replacement employee to a person for performing bargaining unit work for an employer during a lockout of employees in a labor organization or during a strike of employees in a labor organization authorized by a representative of employees.

Minn.Stat. § 179.12(9).

Minn.Stat. § 179.14 (1990) authorizes a district court to grant injunctive relief when any unfair labor practice is "threatened or committed." The district court does not have jurisdiction to issue an injunction

> except after hearing the testimony of witnesses in open court, with opportunity for cross-examination, in support of the allegations made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court to the effect that the acts set forth in sections 179.11 [unfair labor practices by employees] and 179.12 [employers' unfair labor practices] have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained.

*Id.*

■ It is the district court's duty to give the trial or hearing of any suits or proceedings arising under section 179.14 precedence over all other civil suits which are ready for trial. *Id.*

The dispute before this court does not take place in a vacuum. It is played out against the backdrop of a long history of strike-related strife and violence in our state. In 1918, the telephone workers, led by Myrtle Cain, went on strike in Minneapolis and St. Paul. On "Bloody Friday" during the 1934 Truckers' strike in Minneapolis, the police opened fire on strikers at point-blank range, killing two and wounding over fifty. After the deaths of the strikers, the state government and the Na-

---

ing, and placing more than one picket at any entrance to Midwest's facilities. On September 3, 1991, the parties stipulated to the entry of an order enjoining both Midwest and the Union from following closer than one car length for each 10 mph of speed behind each other, except

as required by traffic conditions, and from interfering with the operation of each other on highways or roadways located away from Midwest's premises of the Midwest Motor Express terminal in St. Paul.

tional Guard became involved. During the 1959 Wilson strike, Governor Orville Freeman declared martial law in Albert Lea and ordered the Wilson plant to close down. Once again, the National Guard was called in. More recently, violence has accompanied strikes in Austin and International Falls.

We do not base our holding on respondent's claim that the legislature's concern about strike-related violence brings the statute under an exception to federal labor law preemption. Given that the legislature has expressed its will on such an important subject, however, we are not inclined to conclude that section 179.12(9) is unconstitutional lightly or unadvisedly.

Neither do we write on a blank slate in deciding this case. In making our decision, we are guided by well-established principles of statutory construction as well as the Supreme Court's pronouncements regarding labor law preemption.

■ Our analysis must begin with the recognition that a preemption claim is a challenge to the constitutionality of a statute.[2] Thus, as Midwest's counsel acknowledged at oral argument, the usual presumptions regarding constitutionality apply. It is well established that statutes are presumed to be constitutional. *In re Tveten*, 402 N.W.2d 551, 556 (Minn.1987). It is Midwest's burden to demonstrate beyond a reasonable doubt that the Act violates the Supremacy Clause. *See id.* If the language of the statute can be given two constructions, one constitutional and the other unconstitutional, this court must adopt the constitutional one. *Schumann v. Commissioner of Taxation*, 312 Minn. 477, 481–82, 253 N.W.2d 130, 132 (1977). This is the case even if the constitutional construction is less natural. *Id.* In light of these well-recognized principles, we believe a narrow construction of the statute before us allows it to pass constitutional muster.

■ There are two main types of labor law preemption cases. The first type of labor law preemption is based on *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), in which an employer brought an action against unions to restrain picketing and for damages. The basis for *Garmon* preemption is the primary jurisdiction of the National Labor Relations Board. *Id.* at 242–43, 79 S.Ct. at 778. Under *Garmon*, if the conduct at issue is protected or arguably protected by section 7 of the National Labor Relations Act or prohibited or arguably prohibited by section 8, then the state law is preempted. *Id.* at 245–46, 79 S.Ct. at 780.

The second type of labor law preemption is based on *Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), in which the employer claimed the union members' concerted refusal to work overtime during negotiations for renewal of an expired collective bargaining agreement constituted an unfair labor practice. Under *Machinists*, in deciding whether self-help economic activities are preempted, the question is whether

> "the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes."

*Id.* at 147–48, 96 S.Ct. at 2557 (quoting *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 380, 89 S.Ct. 1109, 1116, 22 L.Ed.2d 344 (1969)).

Although many cases following *Garmon* and *Machinists* have clarified the scope of labor law preemption in other areas,[3] the

---

**2.** *See* Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure*, 2d § 12.1 (1992) ("When Congress exercises a granted power, concurrent conflicting state legislation may be challenged via the Preemption Doctrine; the supremacy clause mandates that federal law overrides, i.e., preempts, any state regulation where there is an actual conflict between the two sets of legislation such that both cannot stand.")

**3.** *See, e.g., Baker v. General Motors Corp.*, 478 U.S. 621, 106 S.Ct. 3129, 92 L.Ed.2d 504 (1986) (Michigan's statutory disqualification for unemployment benefits of employee who provided financing for the strike which caused his unemployment); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d

only controlling precedent cited by the parties involving the issue of preemption of state regulations affecting permanent replacement employees is *Belknap v. Hale*, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983). In *Belknap*, the Court considered whether misrepresentation and breach-of-contract claims brought in state court by strike replacements, who were displaced by reinstated strikers after having been offered and having accepted jobs on a permanent basis, were preempted by federal labor law. The employer in *Belknap* argued, much as Midwest now argues, that allowing the suits "was an impermissible attempt by the Kentucky courts to regulate and burden one of the employer's primary weapons during an economic strike, that is, the right to hire permanent replacements." *Id.* at 499, 103 S.Ct. at 3177. The employer also asserted, as Midwest does now, that "[t]o permit the suit filed in this case to proceed would upset the delicate balance of forces established by the federal law" and that Congress intended that the conduct at issue "be controlled by the free play of economic forces." *Id.* The Court rejected these arguments and concluded that neither cause of action was preempted under *Garmon* or *Machinists.* *Id.* at 512, 103 S.Ct. at 3184.

Midwest contends it would be difficult to hire qualified employees unless they were assured some permanency. This is precisely the effect the dissent in *Belknap* claimed the decision to allow suits by replacement workers would have. *Id.* at 537, 103 S.Ct. at 3197 (Brennan, J., dissenting) ("[I]f an employer decided not to hire replacements on a permanent basis, his ability to hire replacements might be affected adversely.") This argument was also rejected by the majority of the Court in *Belknap.*

In the case before us, all parties agree that, even if the Act is valid, employers are free to hire temporary replacements during a labor dispute. The issue around which the parties' dispute centers, then, becomes what distinguishes the "temporary" replacements, the hiring of which all parties concede is permissible under the Act, from "permanent" replacements. The resolution of this issue depends on our construction of the term "permanent" as it is used in the Act.

The Act does not define "permanent." Neither do we find in the legislative history any clear indication of what the legislature intended this word to mean. This word has a meaning under federal labor law.[4] It also has a meaning under the common law of contracts and case law modifying the employment-at-will rule. *See, e.g., Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983). If the two meanings of permanent were completely separate and distinct, our task would be much easier. That, however, is not the case.

As counsel for Midwest noted at oral argument, the creation of a contract in an actual striker replacement situation is very much dependent upon the facts and circumstances which give rise to that contract. After all, "[w]ords," as Judge Learned Hand once noted,

> are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.

*NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir.1941). We expect that actual offers made by employers to replacement workers in labor dispute situations will be of many different kinds. The character of an actual offer will, of course, depend on various

---

728 (1985) (state statute setting forth minimum mental health care benefits to be provided a covered state resident); *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (state tort of bad faith handling of claim under a disability plan).

**4.** Midwest states in its reply brief: "Under federal law, the term 'permanent replacement' has long been recognized to mean replacement

workers who take the positions of striking workers and who have the right to retain their jobs when the strike ends and the striking workers seek to return to work." This is consistent with the Court's statement in *Belknap* that permanent replacements are employees "whom [the employer] need not discharge even if the strikers offer to return to work unconditionally." *Belknap*, 463 U.S. at 493, 103 S.Ct. at 3174.

factors—the language used, the parties' relationship, the context in which the offer is made, as well as other facts and circumstances taken as a whole.

At one end of the spectrum, there will be cases in which an employer's offer of employment to a replacement worker will clearly meet only the definition of "permanent" as defined under federal labor law. These cases would be outside the reach of the Act as we construe it. *Belknap* does permit state regulation in a case in which the claim is based on or related to the state law of employment contracts. Thus, to the extent that an offer by an employer would not give rise to a colorable claim under Minnesota state law, the offer would be outside the holding of *Belknap*, and, we hold, beyond the reach of the Act.

At the other end of the spectrum, there will be cases in which the offer will clearly meet only the definition of "permanent" under state law. These cases present no constitutional problems. To the extent that this second kind of offer does not amount to regulation of "permanent" offers as defined by the federal labor law, there is no conflict.

There will also be cases that do not fit neatly into either category. That is, some offers will contain elements that (at least partially) meet both the definition of permanent under federal law and under state law. It is these cases that concern us.

We believe that these "hybrid"[5] cases are within the holding of *Belknap* and are not preempted. Since these cases would contain elements which would bring them, at least partially, within the holding of *Belknap*, it would be improper to treat them the same as cases which clearly meet only the federal law definition. Due respect for well-settled rules of statutory construction mandates that these "hybrid" cases be presumed constitutional.

■ It would be proper for the district court to make findings at the section 179.14 hearing as to which of the three kinds of offers existed in the case before it. Classification of an offer would obviously depend on facts and circumstances of the individual case. If the district court determines that an offer made or threatened to be made fell within the first type of offer, then relief under the statute would not be available. If the district court determines that the offer is of the second type, the statute would apply. If the district court determines the offer is not clearly of one type or the other, then the statute would be presumed applicable.

This court recognizes that the reach of the Striker Replacement Act exceeds that of the misrepresentation and breach-of-contract suits in *Belknap*. Other considerations, however, compel our conclusion that the statute, as we construe it, does not violate the Supremacy Clause of the federal constitution. First, due consideration must be given to the presumptions involved in challenging the constitutionality of a statute. Since a narrower construction of the statute avoids constitutional difficulty, we are compelled to adopt that construction. Second, in the only controlling authority cited by any party on the issue of preemption related to offers of permanent employment made to replacement workers during a labor dispute, *Belknap*, the Supreme Court upheld the state regulation. Third, we do not hold that all offers of "permanent" employment to replacement workers are invalid under the statute. Those that have no connection to state contract law would be outside the reach of the statute as we construe it. We believe that this narrows the statute sufficiently so that it passes constitutional muster. We therefore affirm the district court and remand for a determination of the type of offer.

### DECISION

The trial court properly determined that the Minnesota Striker Replacement Act, Minn.Stat. § 179.12(9) (Supp.1991) is constitutional under the Supremacy Clause of the

5. The American Heritage Dictionary defines hybrid as "[s]omething of mixed origin or composition." American Heritage Dictionary 629 (2d college ed. 1982). We use this term in the sense that some offers will not clearly fit just the state or federal law definitions, but rather will have some characteristics of each.

federal constitution and federal labor law. We affirm and remand to the trial court for a determination of the nature of any grant or offer to grant of the status of permanent replacement employee before it.

Affirmed and remanded.