MIDWEST MOTOR EXPRESS,
INC., Petitioner, Appellant,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL 120, Respondent,

and

State of Minnesota, by its Attorney General, Hubert H. Humphrey, III, intervenor, Respondent.

No. C6–92–1126.

Supreme Court of Minnesota.

March 11, 1994.

882

Robert S. Halagan, Alec J. Beck, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, for appellant.

Stephen D. Gordon, Kathryn M. Engdahl, Gordon, Miller, O'Brien, Minneapolis, for International Broth. of Teamsters.

Hubert H. Humphrey, III, Atty. Gen., Scott R. Strand, Michael J. Vanselow, St. Paul, for State of Mn.

Roger A. Peterson, Scott A. Higbee, Peterson, Engberg, & Peterson, Minneapolis, amicus curiae for MN Fed. of Amerc. Federation of Labor–Congress of Industrial Organizations.

Clark Calvin Griffith, II, Minneapolis, amicus curiae for Labor Policy Assoc.

Bradley S. Ervin, St. Paul, amicus curiae for MN Chamber of Commerce.

COYNE, Justice.

This appeal arises out of a strike which commenced on August 12, 1991 at the Roseville shipping facility of Midwest Motor Express, Inc. On August 16, 1991, four days after the beginning of the strike, Midwest secured an order temporarily restraining certain activities of the strikers. After the parties had entered into a stipulation for a limited injunction, Midwest instituted a declaratory action requesting a judgment declaring that Minn.Stat. § 179.12(9) (1992)[1] is unconstitutional because violative of the Supremacy Clause of the United States Constitution. While contending that the issue was not ripe for consideration, the union, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 120, responded that Midwest had stated an intention to hire permanent replacements for the strikers in violation of Minn.Stat. § 179.12(9). When the State of Minnesota intervened in support of the statute, the declaratory judgment action and the injunction suit were consolidated, and the parties interposed cross-motions for summary judgment. The district court concluded that Minn.Stat. § 179.12(9) was enacted to prevent strike violence and was, therefore, excepted from federal preemption. The district court was also of the opinion that preemption was not compelled because the National Labor Relations Act merely permitted an employer to hire permanent replacements for striking employees but "does not, in unmistakably clear language[,] declare that Congress intended this area to be free of state regulation." The district court ordered summary

judgment in favor of Local 120 and the State of Minnesota.

On appeal from the judgment entered on April 1, 1992, the court of appeals affirmed the determination that the Minnesota Striker Replacement Act, Minn.Stat. § 179.12(9) is constitutional. The court of appeals, however, rejected the invitation to hold that the statute was exempt from federal labor law preemption because it was a statute directed to the prevention of strike related violence and, therefore, constituted a valid exercise of the police power. Instead, relying on *Belknap, Inc. v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), the court of appeals ruled that any offer of employment which could give rise to a colorable claim under the state law applicable to employment contracts was exempt from federal labor law preemption. Having affirmed the district court's determination that the Striker Replacement Act is constitutional, the court of appeals remanded the matter to the district court for determination of the nature of any grant or offer to grant the status of permanent replacement employee which shall be submitted for the court's consideration. *Midwest Motor Express, Inc. v. International Bhd. of Teamsters, Local 120,* 494 N.W.2d 895 (Minn.App.1993). We reverse.

Before addressing the determinative question in this case, perhaps it is desirable to examine the court's contention that the question is not ripe for review. Although it is true that this court will determine constitutionality only if the case presents a justiciable issue, we regard the issue here as neither "hypothetical" nor "abstract." Minn.Stat. § 179.12(9) makes it an unfair labor practice for an employer "[t]o grant or offer to grant the status of permanent replacement employee to a person for performing bargaining unit work for an employer * * * during a strike of employees in a labor orga-

1. Minn.Stat. § 179.12 (1992) provides:

It is unfair labor practice for an employer:

\* \* \* \* \* \*

(9) To grant or offer to grant the status of permanent replacement employee to a person for performing bargaining unit work for an employer during a lockout of employees in a labor organization or during a strike of em-

ployees in a labor organization authorized by a representative of employees.
A court may enjoin an unfair labor practice, Minn.Stat. § 179.14 (1992), and commission of an unfair labor practice may prevent an employer from securing relief on its own behalf. Minn. Stat. § 179.15 (1992). The violation of section 179.12(9) is also an unlawful act. Minn.Stat. § 179.12(10).

nization authorized by a representative of employees." Midwest has expressed its intention here to hire permanent replacement employees to perform the work of the striking employees, and the record demonstrates that it did engage permanent replacement workers in its struck North Dakota Facility; as a result, the district court was entitled to believe Midwest's assertions of its intent to hire such workers and that its bargaining strategy was hampered by the stricture of the statute. Minn.Stat. § 179.14 (1992) provides that the threat as well as the commission of an unfair labor practice is subject to injunction. Under the circumstances, we are of the opinion that Midwest should not be required to risk the loss of its current injunctive relief in order to challenge the Striker Replacement Act. Indeed, as we observed on an earlier occasion, the declaratory judgment action provided by Minn.Stat. § 555.01 (1992), which recognizes the court's "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed * * *," is singularly appropriate for the resolution of disputes before the commission of wrongs. *Culligan Soft Water Serv. of Inglewood, Inc. v. Culligan Int'l Co.,* 288 N.W.2d 213, 215–16 (Minn.1979).

The principal expression of federal labor law has since 1935 been found in the National Labor Relations Act, commonly identified by its initials NLRA. The question presented by this case, whether an employer's engagement of permanent replacements for striking workers constitutes an unfair labor practice within section 8(1) of the NLRA, surfaced almost immediately after its enactment. *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

On October 4, 1935, Local No. 3 of the American Radio Telegraphists Association called a strike of the land operators employed by Mackay at its San Francisco office. Mackay maintained service by bringing employees from other offices to fill the strikers' places. Mackay promised 11 of the men brought to San Francisco that if they wished to remain in San Francisco, they would not be displaced when the striking employees returned to work. The strikers soon became convinced that the strike would fail, and they inquired of the traffic supervisor whether they might return to work. The supervisor said that the men could return to work in a body but he checked off the names of 11 strikers who would be required to apply for reinstatement. The men returned to work with 6 of the 11 in question resuming their work without challenge because only 5 of the new employees wished to stay in San Francisco. The other five strikers on the list, those most prominent in the activities of the union, and in connection with the strike, were not reinstated, and the National Labor Relations Board charged that Mackay had refused to re-employ the five strikers

for the reason that they had joined and assisted the labor organization known as Local No. 3 and engaged with other employes in concerted activities for the purpose of collective bargaining and other mutual aid and protection; that the refusal to reemploy them restrained and coerced the employes in the exercise of rights guaranteed by § 7 and so constituted an unfair labor practice within § 8(1) of the Act. The amended complaint further asserted that the refusal to re-employ these men discriminated in regard to their hire and tenure of employment and discouraged membership in Local No. 3 and thus amounted to an unfair labor practice under § 8(3) of the Act.

*Id.* at 340, 58 S.Ct. at 908. The Board ordered the employer to reinstate the five men to their former positions with backpay. The Court of Appeals for the Ninth Circuit refused to enforce the order.

On appeal to the United States Supreme Court Mackay contended that the NLRB lacked jurisdiction because Mackay had not committed any unfair labor practice. The Supreme Court agreed with Mackay that it was not an unfair labor practice

to replace the striking employes with others in an effort to carry on the business. Although § 13 provides, 'Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike,' it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect

and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by [Mackay] to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled.

*Id.* at 345–46, 58 S.Ct. at 911 (footnote omitted).

In addition to the NLRB's determination that the refusal to reinstate all of the strikers constituted an unfair labor practice because it restrained and coerced employees in their exercise of rights guaranteed by the NLRA, however, the Board had found that Mackay discriminated when it refused to reinstate certain employees solely because they had been the most active in the union. The Court held that the strikers remained employees as long as their work had ceased as a consequence of or in connection with a current labor dispute or because their employer had committed an unfair labor practice. Because the strikers retained their status as employees, section 8 of the NLRA prohibited the employer from discriminating against striking employees by refusing to reinstate certain of them solely because of their leadership in the union activities.

The Supreme Court made it quite clear, however, that it was not the engagement of permanent replacements for the strikers nor the refusal to reinstate strikers to the jobs held by the replacement workers, but only Mackay's discrimination against the leaders of the union that constituted an unfair labor practice:

As we have said, the respondent was not bound to displace men hired to take the strikers' places in order to provide positions for them. It might have refused reinstatement on the ground of skill or

ability, but the Board found that it did not do so. It might have resorted to any one of a number of methods of determining which of its striking employes would have to wait because five men had taken permanent positions during the strike, but it is found that the preparation and use of the list, and the action taken by [Mackay], were with the purpose to discriminate against those most active in the union. There is evidence to support these findings.

*Id.* at 347, 58 S.Ct. at 911.

In the present case the state contends, as have some commentators,[2] that the Supreme Court's declaration that permanently replacing strikers is not prohibited by the NLRA and does not constitute an unfair labor practice should be dismissed as mere dictum. However, the Supreme Court itself has ever since *Mackay* characterized and applied that statement as "holding,"[3] relying upon its generally stated principle that an employer does not commit an unfair labor practice when it permanently replaces striking employees as the cornerstone for later decisions. *E.g., Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, 433, 109 S.Ct. 1225, 1230, 103 L.Ed.2d 456 (1989); *Belknap, Inc. v. Hale,* 463 U.S. at 504 n. 8, 103 S.Ct. at 3179–80 n. 8; *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 379, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967); *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 232, 83 S.Ct. 1139, 1147, 10 L.Ed.2d 308 (1963). Furthermore, over the years the *Mackay* doctrine has become so integral a part of the fabric of federal labor law that in recent decisions of the NLRB it is assumed without articulation. *J.M.A. Holdings Inc. and Food & Commercial Workers Local 770,* 310 NLRB 1349, 143 LRRM 1105 (May 12, 1993); *Solar Turbines Inc. and Machinists Lodge 685,* 302 NLRB 14, 136 LRRM 1249 (March 11, 1991).

■ The determinative question, of course, is whether the Minnesota legislature

---

2. *See, e.g.,* LeRoy, *The* Mackay Radio *Doctrine of Permanent Striker Replacements and the Minnesota Picket Line Peace Act: Questions of Preemption,* 77 Minn.L.Rev. 843 (1993).

3. The dissent recognizes this, but then continues its argument predicated on its own contrary characterization of the principle as "dictum."

has, by enacting the Minnesota Striker Replacement Act, trespassed on territory preempted by Congress and, in so doing, enacted a statute violative of the Supremacy Clause of the United States Constitution. There are two distinct bases for federal labor law preemption. One of these bases, the exclusivity of the jurisdiction of the National Labor Relations Board with respect to conduct regulated by the NLRA, is analyzed in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In *Garmon*, the Supreme Court held that a California court could not award damages to an employer for interference with its business caused by unlawful union picketing, which the state court had held to be "a tort based on an unfair labor practice under state law." *Id.* at 239, 79 S.Ct. at 776. Garmon, a seller of lumber and other building materials, brought an action against the Building Trades Council in state court seeking an injunction and damages resulting from picketing by the Council unions, none of which had been designated by Garmon's employees as their collective bargaining agent. The purpose of the picketing was to compel execution of a contract containing a closed shop provision. Before bringing the state court action, Garmon had instituted representation proceedings before the NLRB, but the Board declined jurisdiction. The state court enjoined the picketing until one of the unions had been properly designated as a collective bargaining agent and awarded damages for Garmon's losses. On the first occasion that the *Garmon* case reached the United States Supreme Court, it ruled that the NLRB's refusal to assert jurisdiction did not give the state power to regulate activities otherwise preempted, even though denying the state jurisdiction in such a case may result in a "no-man's land," subject to regulation neither by agency nor state. *San Diego Building Trades Council v. Garmon*, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (1957); *Guss v. Utah Labor Relations Board*, 353 U.S. 1, 10–11, 77 S.Ct. 598, 603, 1 L.Ed.2d 601 (1957); *Amalgamated Meat Cutters, Local No. 427 v. Fairlawn Meats, Inc.*, 353 U.S. 20, 23–24, 77 S.Ct. 604, 606, 1 L.Ed.2d 613 (1957).

On remand, the California court set aside the injunction but sustained the award of damages pursuant to state tort law. The United States Supreme Court again granted certiorari and, quoting from *Weber v. Anheuser–Busch, Inc.*, 348 U.S. 468, 480–81, 75 S.Ct. 480, 488, 99 L.Ed. 546 (1955), described the Court's role in determining what labor activities are open to state regulation:

> Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy judicial exclusion of state action. Such was the situation in *Garner v. Teamsters Union, supra.* But as the opinion in that case recalled, the Labor Management Relations Act 'leaves much to the states, though Congress has refrained from telling us how much.' 346 U.S. [485] at 488 [74 S.Ct. 161, 164, 98 L.Ed. 228 (1953) ]. This penumbral area can be rendered progressively clear only by the course of litigation.

*Garmon*, 359 U.S. at 240, 79 S.Ct. at 777.

The Court pointed out that in determining the extent to which state regulation must yield to subordinating federal authority, the Court had been "concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration." *Id.* at 242, 79 S.Ct. at 778. The Court went on to say that it was not the business of the courts to ascertain the precise nature and degree of federal/state conflict in a particular labor dispute—those precise and closely limited demarcations that can be adequately fashioned only by legislation and administration must be left to the National Labor Relations Board and to Congress. *Id.* The Court acknowledged its consistent regard for the fact that Congress had not merely laid down a substantive rule of law, but that it had entrusted interpretation and application of the nation's labor policy to a centralized administrative agency, the NLRB, which was to follow a particular Congressionally pre-

scribed procedure. *Id.* at 243, 79 S.Ct. at 778.

"Administration", said the Court, "is more than a *means* of regulation; administration *is* regulation." *Id.* at 243, 79 S.Ct. at 778 (emphasis supplied). Having pointed out that the nature of the activities which the state seeks to regulate is the crux of the issue rather than the method of regulation adopted, Justice Frankfurter noted first the Court's disinclination to find withdrawal from the states of power to regulate an activity which is a merely peripheral concern of the NLRA, then set out a serious type of concern left open to state regulation: "or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 244, 79 S.Ct. at 779. Nevertheless, the Court went on to rule:

> When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

*Id.* at 245, 79 S.Ct. at 779.

In the present case the district court sustained the Striker Replacement Act under two apparently contradictory *Garmon* theories: That the hiring or permanent replacement of strikers is neither prohibited nor protected in the NLRA and that the statute falls under the "compelling state interest exception." However, in the light of the declaration in *Mackay* that nondiscriminatory permanent replacement of strikers is *not* an unfair labor practice and the consistent recognition by the Supreme Court of a federal "right to hire replacements," *e.g., Trans World Airlines,* 489 U.S. at 437, 109 S.Ct. at 1232, it cannot reasonably be asserted that the right to hire permanent replacements is not at least "arguably protected" by the NLRA. Even if we adopted the distinction made by the district court—that the NLRA does not expressly guarantee the right to hire permanent replacements and that the conduct is therefore not "protected"—other federal interests raise preemption concerns.

A case that involves an unfair labor practice falls under the exclusive jurisdiction of the NLRB. *Sears, Roebuck & Co. v. San Diego County Distr. Council of Carpenters,* 436 U.S. 180, 197, 98 S.Ct. 1745, 1757, 56 L.Ed.2d 209 (1978) ("The critical inquiry * * * [is] whether the controversy presented to the state court is identical to * * * that which could have been, but was not, presented to the [NLRB].") *Sears* involved jurisdiction and not the facial validity of a state law, but the opinion made no distinction. The state claims here that *Garmon* preemption does not apply because the situation is not "identical with that which could be presented to the [NLRB]." But although the controversy in its present posture as a declaratory action may not come within the NLRB's exclusive jurisdiction, if Midwest hires or even offers to hire anyone as a permanent replacement for a striking employee, it will commit an unfair labor practice pursuant to Minn.Stat. § 179.12(9). In that event the controversy presented to the NLRB and within its exclusive jurisdiction would be identical to that presented here: whether Minn.Stat. § 179.12(9) violates the Supremacy Clause of the United States Constitution by precluding employment of an economic weapon which Congress intended to be unregulated; only the posture of the controversy would be different.

The union argues forcefully that Minn.Stat. § 179.12(9), which it dubs the Minnesota Picket Line Peace Act, is directed to a "compelling local interest" and is, therefore, within the exception the *Garmon* Court carved out of federal preemption. Although it is true that enactment of the Minnesota Striker Replacement Act followed rather closely on the heels of a labor dispute attended by violence after the employer hired permanent replacements for its striking workers, we agree with the court of appeals that our decision cannot rest on the "compelling local interest" exception to federal preemption. The Striker Replacement Act does not directly address strike-related violence as did the Wisconsin Employment Peace Act, which was declared constitutional in *Allen–Bradley Local No. 1111, United Electrical, Radio & Machine Workers v. Wisconsin Employment*

*Relations Board,* 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942). The statute directly attacks only the employer's use of an economic weapon. Any reduction of violence resulting from prohibiting the permanent replacement of strikers is simply an indirect benefit of the statute. Despite its recognition that permitting an employer to hire replacements heightens tensions—

> "It is the inevitable effect of an employer's use of the economic weapons available during a period of self-help that * * * differences [between strikers and replacements] will be exacerbated."

*Trans World Airlines,* 489 U.S. at 437, 109 S.Ct. at 1232—the Supreme Court once again reaffirmed the declaration in *Mackay* that the permanent replacement of striking employees was not an unfair labor practice under the NLRA. *Id.* at 433, 109 S.Ct. at 1230. Moreover, it is apparent that when the Minnesota legislature intended to curb picket line violence, it knew how to aim directly at its intended purpose. For example, Minn. Stat. § 179.13 (1992) specifically makes it unlawful to interfere with the free and uninterrupted use of public roads or to wrongfully obstruct ingress to and egress from any place of business or employment, and it also makes it an unfair labor practice for any employee or labor organization to commit such an unlawful act.

■ The other federal labor law supremacy doctrine, *"Machinists* preemption" was developed in *Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Com'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In the midst of negotiations a union engaged in a concerted ban on overtime work, conduct which Wisconsin concluded constituted an unfair labor practice pursuant to a Wisconsin statute. *Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Com'n,* 67 Wis.2d 13, 226 N.W.2d 203 (1975), *rev'd* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Reversing the Wisconsin's court determination that since the overtime ban was neither expressly protected nor expressly prohibited by the

NLRA, the state was free to regulate it, the Supreme Court discussed the preemption analysis developed in *Garmon* and its progeny.[4] Justice Brennan then explained the development of the second preemption doctrine:

> [A] second line of pre-emption analysis has been developed in cases focusing upon the crucial inquiry whether Congress intended that the conduct involved be unregulated because left 'to be controlled by the free play of economic forces.'

> \* \* \* \* \* \*

> [A] particular activity might be 'protected' by federal law not only when it fell within § 7, but also when it was an activity that Congress intended to be 'unrestricted by *any* governmental power to regulate' because it was among the permissible 'economic weapons in reserve, actual exercise [of which] on occasion is part and parcel of the system that the Wagner and Taft–Hartley Acts have recognized.'

*Id.* at 140–41, 96 S.Ct. at 2553–54 (citing *NLRB v. Nash–Finch Co.,* 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971); *NLRB v. Insurance Agents, Int'l Union,* 361 U.S. 477, 488–89, 80 S.Ct. 419, 427, 4 L.Ed.2d 454 (1960)). "[S]elf-help is * * * the prerogative of the employer because he, too, [like the union and employees] may properly employ economic weapons Congress meant to be unregulable." *Machinists,* 427 U.S. at 147, 96 S.Ct. at 2556. Although its ruling left the employer without recourse, the Court declared that "the economic weakness of the affected party cannot justify state aid contrary to federal law for * * * 'the use of economic pressure by the parties to a labor dispute is not a grudging exception * * * [to the] Act; it is part and parcel of the process of collective bargaining.'" *Id.* at 149, 96 S.Ct. at 2557 (quoting *Insurance Agents,* 361 U.S. at 495, 80 S.Ct. at 430).

The Wisconsin statute violated the Supremacy Clause of the United States Constitution by entering "into the substantive aspects of the bargaining process to an extent

---

**4.** *See, e.g., Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971) for a summary history of *Garmon* preemption.

Congress has not countenanced." *Machinists,* 427 U.S. at 149, 96 S.Ct. at 2557 (quoting *Insurance Agents,* 361 U.S. at 495, 80 S.Ct. at 432). For the reasons articulated in the *Machinists* opinion, we hold that Minn. Stat. § 179.12(9), which interferes, as did the Wisconsin statute, with the substantive aspects of the bargaining process by branding as unlawful an economic device Congress intended to be unregulated, is preempted by federal law.

Rejecting the preemption doctrine explicated in *Garmon* and *Machinists,* the court of appeals regarded *Belknap, Inc. v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 as the sole controlling precedent. *Belknap,* however, does not address the issue before us: whether the Minnesota Striker Replacement Act has, by declaring the hiring or offer to hire workers as permanent replacements for striking employees an unfair labor practice, encroached on an area of labor law preempted by Congress.

*Belknap* arose out of a strike but involved a cause of action which arose after the union and the employer had entered into a new collectively bargained agreement ending the strike. Shortly after the strike had begun, Belknap increased the wages of any union employee who stayed on the job, but about 400 union members went out on strike. Then Belknap advertised, seeking job applicants to "permanently replace striking warehouse and maintenance employees." The ad attracted many applicants and Belknap hired several replacement employees. Twice during the pendency of an unfair labor practice complaint based on the company's unilateral wage increase to union employees who continued working during the strike, Belknap distributed letters to the replacement employees assuring them that they would not be displaced by returning strikers.

Nevertheless, in order to reach a new agreement and settle the strike, Belknap agreed to reinstate at least 35 strikers per week, and in order to make room for the returning strikers, Belknap fired the replacements. Twelve of the discharged replacement workers then sued Belknap in state court for misrepresentation and breach of contract, each of them seeking $250,000 in compensatory damages and an equal amount in punitive damages. The Kentucky court decided that the action based on misrepresentation and breach of contract was not preempted, and on certiorari the United States Supreme Court affirmed.

Justice White's opinion began with this paragraph:

> The federal labor relations laws recognize both economic strikes and strikes to protest unfair labor practices. Where employees have engaged in an economic strike, the employer may hire permanent replacements whom it need not discharge even if the strikers offer to return to work unconditionally. If the work stoppage is an unfair labor practice strike, the employer must discharge any replacements in order to accommodate returning strikers. In this case we must decide whether the National Labor Relations Act (NLRA or Act) pre-empts a misrepresentation and breach-of-contract action against the employer brought in state court by strike replacements who were displaced by reinstated strikers after having been offered and accepted jobs on a permanent basis and assured they would not be fired to accommodate returning strikers.

*Id.* at 493, 103 S.Ct. at 3174.

It is abundantly apparent from the foregoing excerpt that the decision in *Belknap* does not represent a retreat from the Court's time-honored position that the employer's right to hire permanent replacements whom it need not discharge in order to accommodate strikers seeking reinstatement is protected under federal labor law. Rather, the rationale for the *Belknap* decision reinforces the idea that federal labor law intends to permit the use of economic weapons by both sides of a labor dispute. The Supreme Court set out the rationale in these words:

> It is one thing to hold that the federal law intended to leave the employer and the union free to use their economic weapons against one another, but is quite another to hold that either the employer or the union is also free to injure innocent third parties

without regard to the normal rules of law governing those relationships.

*Id.* at 500, 103 S.Ct. at 3178.

Here, of course, the shoe is on the other foot. Minn.Stat. § 179.12(9) makes the hiring of permanent replacements an unfair labor practice and an unlawful act. It seems to us that under these circumstances the distinction drawn by the Supreme Court might be restated in this way: It is one thing to say that an employer may not, with impunity, misrepresent the terms of employment or breach an employment contract with a replacement employee who is unrepresented in both the negotiations between union and employer and in proceedings before the NLRB, and it is, indeed, quite another to prohibit the employer from hiring permanent replacements on pain of committing an unlawful act and an unfair labor practice, which would require the employer to discharge the replacements to make room for the returning strikers.

In short, even though *Belknap* does not address the issue before us, the *Belknap* decision serves as fair warning that an employer that hires employees to permanently replace striking employees—without qualification and without conditioning the offer of permanency on the terms upon which the employer and the union representing the striking employees ultimately settle the strike and also conditioning permanency on the absence of an NLRB order to reinstate the strikers—hires those replacement employees at the employer's peril. Inasmuch as the Supreme Court has declared that a "permanent" replacement contract may be so conditioned, any attempt to construe Minn. Stat. § 179.12(9) to avoid confrontation with federal law appears fruitless. And to say as does the court of appeals that any offer of employment as a permanent replacement which could give rise to a colorable claim under Minnesota state law is beyond the reach of federal labor law is presumptuous. No matter how one defines "permanent", it

seems to us that granting or offering to grant the status of permanent replacement employee comes, at least arguably, under the umbrella of federal labor law and is, therefore, preempted. *Garmon*, 359 U.S. at 245, 79 S.Ct. at 779.

Fifty-five years have gone by since the Supreme Court ruled in *Mackay* that an employer does not commit an unfair labor practice by hiring permanent replacements for striking employees. More than 30 years ago the Court characterized the use of economic pressure as "part and parcel of the process of collective bargaining." *Insurance Agents*, 361 U.S. at 495, 80 S.Ct. at 430 (1960). In addition to major revisions of the basic federal labor statute in 1947 and 1959, Congress has frequently demonstrated its capacity to amend the statute to conform with its regulatory intention. But Congress has never seen fit to limit in any respect the employer's right to hire permanent replacements for striking employees.

Congress has, however, intervened to adjust perceived imbalances in the use of economic weapons. Thus, in 1947 when the public reacted with a strong anti-union sentiment in response to what was regarded as arrogance and irresponsibility on the part of union labor leaders, Congress enacted the Taft–Hartley Act, which outlawed the closed shop and required a 60–day "cooling-off period" before a strike, in addition to imposing liability on a union for damages caused by its breach of contract.

It may be that the scales have once again become somewhat unbalanced and that in consideration of changes in the economic climate and the escalation of violence in our society, it is time for Congress to revisit the regulation of the use of economic weapons. If, however, there is an imbalance in economic weaponry, it is not a regional problem to be addressed in whatever manner, or not at all, as each state sees fit; it is a national problem which requires uniform treatment by Congress.[5]

---

**5.** In 1991 Congress had before it proposed legislation to make hiring or offering to hire permanent replacements for strikers an unfair labor practice but did not enact it. *See* S.55, 102d Cong., 1st Sess. (1991) and H.R. 5, 102d Cong.,

1st Sess. (1991). We understand that the House of Representatives has recently passed legislation making it an unfair labor practice to grant or offer to grant permanent status to employees hired to replace strikers and that a similar bill is

Finally, if a state may regulate the employer's right to hire *permanent* replacements for striking employees without violating the Supremacy Clause because the employer's right to use economic weapons is not within the purview of federal labor law, then nothing prevents a state from outlawing the hiring of *any* replacement worker during a strike. In summary, the decision to regulate the use of economic weapons or to continue to permit their unfettered use is for Congress. In either event the decision is preempted by federal labor law and this state and this court are constrained by the Supremacy Clause of the United States Constitution from interfering with that decision.

Reversed.

WAHL, Justice, dissenting.

I respectfully dissent from the holding of the majority that the Minnesota Striker Replacement Act, Minn.Stat. § 179.12(9) (1992), is preempted by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. (1988), and is thus in violation of the Supremacy Clause of the United States Constitution. Any consideration of possible preemption of section 179.12(9) by the National Labor Relations Act must begin with an understanding of the Act's core provisions.

The National Labor Relations Act guarantees workers the right to join unions, to bargain collectively, and "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." 29 U.S.C. § 157. The primary "concerted" activity which provides workers the ability to engage in meaningful collective bargaining is the strike. Absent this ability to strike, workers have little or no bargaining power. Congress recognized this fact and, in addition to the other relevant language in the NLRA, specifically addressed the right to strike as follows:

Nothing in this [Act], except as specifically provided for herein, shall be construed so as either to interfere with or impede or

diminish in any way the right to strike * * *.

29 U.S.C. § 163.

The NLRA prohibits employers from discharging or disciplining employees for exercising their right to strike. 29 U.S.C. § 158(b)(4). The clear NLRA mandate of protecting workers' right to strike is wholly consistent with Minn.Stat. § 179.12(9) which prohibits employers from responding to a strike by hiring permanent replacement workers.

The United States Supreme Court has made it clear that there is a presumption against preemption of state law. As the Court recently reemphasized, "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Building & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./ Rhode Island Inc.,* —— U.S. ——, ——, 113 S.Ct. 1190, 1194, 122 L.Ed.2d 565 (1993) (citation omitted). When Congress does intend to preempt state law, it does so expressly or impliedly. Congress included no express preemption language in the NLRA. *Id.* Absent explicit preemption, the United States Supreme Court has recognized two types of implied preemption: preemption of the entire field, or field preemption, and conflict preemption. *Gade v. National Solid Wastes Management Ass'n,* —— U.S. ——, ——, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992) *quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206 (1985) ("Congress * * * has never exercised authority to occupy the entire field in the area of labor legislation.") The question then becomes whether there is "conflict preemption," in that section 179.-12(9) would stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade,* —— U.S. at ——, 112 S.Ct. at 2383. The Supreme Court has made clear that even in NLRA cases, it "[is] reluctant to infer pre-

presently pending before the Senate. *See* H.R. 5, 103d Cong., 1st Sess. (1993); S. 55, 103d Cong., 1st Sess. (1993).

emption." *Building & Construction Trades,* — U.S. at ——, 113 S.Ct. at 1994. There is a strong presumption that Minn.Stat. § 179.-12(9) is not preempted.

In addition to the general law of preemption, two specific principles have developed around the NLRA. The *Garmon* preemption principle prohibits state regulation of activities that are actually or arguably "protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8 * * *." *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* preemption does not apply in this case for a number of reasons. First, nothing in the NLRA expressly provides protection for an employer's hiring of permanent replacement workers. Second, not only does the NLRA contain no language that even arguably protects the practice of hiring permanent replacements, the opposite appears true. The NLRA's prohibition on discharge of strikers and its mandate that the Act not be construed to impede the right to strike indicate that prohibiting a practice such as hiring permanent replacements is more in line with the language and policies of the Act than allowing the practice. There is no real distinction between the threat of discharge and the threat of permanent replacement; with both, workers are threatened with permanently losing their jobs.

The issue here, however, is not whether the NLRA prohibits the practice of hiring permanent replacements, which the Supreme Court has said it does not, but whether the NLRA protects the hiring of permanent replacement workers. Given the absence of express protection, the language and policy of the Act protecting the right to strike, and the express prohibition of similar employer conduct, the NLRA cannot be read to protect the practice of hiring permanent replacement workers, and therefore, *Garmon* preemption does not apply.

The majority opinion, relying on Supreme Court case law, concludes that "it cannot reasonably be asserted that the right to hire permanent replacements is not at least 'arguably protected' by the NLRA." I disagree. In *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), the United States Supreme Court declared in dicta that the NLRA does not require employers who replace striking workers to discharge the replacements in order to make room for the strikers. *Id.* at 345–46, 58 S.Ct. at 911. The National Labor Relations Board had held that the employer's refusal to reinstate all of the strikers was an unfair labor practice. *Id.* at 340–41, 58 S.Ct. at 908. The *Mackay* court, however, said it was an unfair labor practice only if an employer *selectively* refused to reinstate striking employees because of their union activities. *Id.* at 346, 58 S.Ct. at 911. Subsequent to *Mackay,* other Supreme Court decisions have characterized the *Mackay* dicta as a holding. *E.g., Belknap, Inc. v. Hale,* 463 U.S. 491, 505, n. 8, 103 S.Ct. 3172, 3179–80, n. 8, 77 L.Ed.2d 798 (1983).

The rule created in *Mackay* dicta is not sufficient to overcome the strong presumption against preemption and to compel the conclusion that Congress intended to protect an employer's hiring of permanent replacement workers. Such a rule contradicts both the policies and the express language of the NLRA. Labor-management experiences [1] in

**1.** Since 1980, there has been both a sharp drop in the number of work stoppages and an increase in the expressed willingness of employers to hire permanent replacements for strikers. Roughly two-thirds of unions reported that employers were much more likely to use the permanent replacement strategy during the late 1980s than they were during the late 1970s. Although no study has established a relationship between growing employer willingness to hire permanent replacements and the sharply diminished number of strikes, the impact that the replacement strategy has had on union decisionmaking during the 1980s suggests such a relationship.

     \*    \*    \*    \*    \*

Unions and employers watched \* \* \* strikes during the past decade to assess the effectiveness of striking when an employer threatens to hire, or actually hires, permanent replacements; they have seen that, on balance, the unions lost these strikes decisively. Furthermore, unions have seen that employers are more willing to hire permanent replacements and, accordingly, that their members are more likely to lose their jobs.

Michael H. LeRoy, *The Mackay Radio Doctrine of Permanent Strike Replacements and the*

recent years strongly suggest that the threat of potential permanent loss of a job as a result of striking "impedes" an employee's right to strike, in contravention of the express language of section 163 of the NLRA. Furthermore, to say that the NLRA does not prohibit the practice of hiring replacement workers is not to say that the NLRA protects, or even arguably protects, that practice even if the practice is referred to as a right. The NLRA guarantees and preserves certain rights for employees. 29 U.S.C. §§ 157, 163. Beyond that there are only prohibitions of certain kinds of conduct by employers and unions. 29 U.S.C. § 158. Given the strong presumption against preemption and the express language and clear policy of the NLRA, the rule created by *Mackay* dicta is not sufficient to pull Minn.Stat. § 179.12(9) within the *Garmon* preemption principle.

The *Machinist* preemption doctrine precludes states from regulating conduct that Congress intended to be left to the "free play of economic forces." *Lodge 76, Int'l. Ass'n of Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 155, 96 S.Ct. 2548, 2560, 49 L.Ed.2d 396 (1976). States may not enact regulations concerning certain "economic weapons," but are still free to regulate in certain areas concerning the substantive terms and conditions of employment. *Id.* at 141, 96 S.Ct. at 2553. For example, laws have been upheld concerning minimum standards for pension plans, *Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978), mental health care, *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), and severance pay, *Fort Halifax Meat Packing Co., Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), despite the fact that the issues could arise in collective bargaining.

In the specific area of replacement workers, the Supreme Court has indicated that states are not prohibited from applying their laws. *Belknap, Inc. v. Hale*, 463 U.S. 491,

103 S.Ct. 3172, 77 L.Ed.2d 798 (1983).[2] In *Belknap*, replacement employees who were discharged after accepting jobs on a permanent basis were allowed to bring misrepresentation and breach-of-contract actions in state court. *Id.* at 496, 103 S.Ct. at 3175. Despite the fact that the application of the state law would affect the manner in which employers could hire and fire replacement employees and use the threat of permanent replacements against strikers, the state law was not preempted. *Id.* at 497, 103 S.Ct. at 3175. Section 179.12(9) directly affects the relationship between employers and replacement employees, but instead of permitting state court misrepresentation and breach-of-contract actions, the Minnesota law prohibits employers from hiring workers on a permanent basis. Although language in *Belknap* indicates continued adherence to the *Mackay* rule, the case demonstrates that the area of replacement workers is not completely free from state regulation.

Perhaps a more important reason foreclosing *Machinist* preemption is that the practice of hiring permanent replacements cannot be considered a protected "weapon" of the employer. Congress expressly prohibited discharging employees as a weapon against striking employees, presumably because granting the employer that power would destroy all bargaining power of employees and eliminate their ability to strike. An employer effectively bypasses the prohibition on discharge by hiring permanent replacement workers to fill strikers' positions. The employer need not ever rehire replaced strikers unless a replacement worker leaves his or her position. Once permanent replacements are hired, striking workers have no bargaining power, and the employer has no incentive to bargain in good faith. Furthermore, even if the strike is settled, workers are still unemployed unless the workers who replaced them leave the job. With this outlook, it is impossible to believe that a worker's will to

---

*Minnesota Picket Line Peace Act: Questions of Preemption*, 77 Minn.L.Rev. 843, 850–53 (1993).

**2.** The Supreme Court itself has limited an employers relationship with replacement workers, prohibiting the granting of superseniority, *NLRB*

*v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963) or additional vacation pay, *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967) to replacements.

strike is not greatly diminished, thereby diminishing the right to strike granted by the NLRA. The NLRA states that nothing in the Act "shall be construed so as either to interfere with or impede or diminish in any way the right to strike * * *." 29 U.S.C. § 163. Construing the NLRA to protect the threat, or actual hiring, of permanent replacement workers clearly violates this Congressional mandate. For all of the reasons above, *Machinist* preemption does not apply to Minn.Stat. § 179.12(9).

Finally, although not the foundation for this dissent, Minnesota does have the right to pass laws to protect the safety of its citizens. Section 179.12(9) does just that. The most important factor contributing to strike-related violence, according to the affidavit of Professor Hyman Berman, is the perception by strikers that "their job security is being threatened." This perception "arises immediately when employers hire permanent replacements." Professor Berman stated:

> Otherwise peaceful strikes often become violent only *after* the employer hires permanent replacements. For example, the Hormel strike of the mid–1980's in Austin, Minnesota, was peaceful for many months, and erupted in serious violence immediately after the employer hired permanent replacements. Similarly, the Pittston coal strike was peaceful until permanent replacements were brought in.

Section 179.12(9) effectively eliminates a primary cause of strike-related violence.

I would hold that Minn.Stat. § 179.12(9) is not preempted by the NLRA and would affirm the decision of the court of appeals.

GARDEBRING, Justice.

I join in the dissent of Justice WAHL.