**Daniel O. DAWSON and Gayle S. Dawson, Plaintiffs**

v.

**HOWMEDICA, INC., Pfizer, Inc., and Pfizer Hospital Products Group, Inc., d/b/a Howmedica, Defendants.**

No. 3:93–cv–222.

United States District Court,
E.D. Tennessee,
at Knoxville.

Jan. 19, 1995.

Nicholas C. Moraitakis, Roger Mills, Glenn E. Kushel, Mills & Moraitakis, Atlanta, GA, for plaintiffs.

Glen G. Reid, Jr., McDonnell Boyd, Memphis, TN, John Alvah Gilleland, Traci Leigh Green, Love and Willingham, Atlanta, GA, for defendants.

### *MEMORANDUM OPINION*

JARVIS, Chief Judge.

This is a products liability action alleging both design and manufacturing defects of an

artificial knee, a PCA Total Knee Prosthesis (the "PCA Knee"), manufactured by defendant Howmedica, Inc. ("Howmedica"). The PCA Knee was sold and implanted at Methodist Medical Center in Oak Ridge, Tennessee by an orthopedic physician, Dr. Cletus McMahon. Currently pending is defendants' motion for summary judgment [Doc. No. 19]. For the reasons that follow, defendants' motion will be granted.

## Factual Background

Plaintiffs proceed under the products liability theories of negligence, strict liability for design and manufacturing defects, and breach of express and implied warranties. The knee prosthesis at issue was implanted without the use of bone cement by Dr. McMahon in Mr. Dawson's right leg on January 22, 1987. According to Dr. McMahon, it would have been his hope as an orthopedic surgeon implanting the PCA Knee that it would last up to 15 or 20 years. He testified that he would have told Mr. Dawson that the device could last up to that period of time, but also testified that "there was a very good likelihood that [Mr. Dawson] might have to have a revision, and that could be [within] a few years or 10 years or hopefully 20 years." [*See* Doc. No. 24, Ex. A].

Approximately five years after it was implanted, it became apparent that Mr. Dawson's knee implant had failed. On January 10, 1992, Dr. McMahon performed surgery, during which he confirmed that there was a polyethylene wear of the patella or knee cap part of the device, with a large area that was denuded down to the metal underneath the polyethylene. He also determined that there was an obvious fracture or breakage of the medial aspect of the polyethylene tibial component of the PCA Knee. Dr. McMahon testified that the tibial component also exhibited wearing and thinning, which Dr. McMahon characterized as "delamination." However, Dr. McMahon described this as "just the wear and tear of doing normal every day activities" after five years of use. [*See* Doc. No. 20, Ex. B, pp. 15–16]. He testified that he did not see anything wrong with the implant to indicate that "it had been manufactured improperly or had not been put together correctly." [*Id.* at p. 17].

Dr. McMahon explained that when he selected the PCA Knee, as opposed to other total knee replacement products available on the market, he did so because of his research and knowledge of the orthopedic literature. He chose to use the PCA Knee in part because it could be implanted without the use of bone cement [*see* Doc. No. 20, Ex. B, pp. 8–13].[1]

## Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper if there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The facts and all reasonable inferences to be drawn therefrom are viewed in a light most favorable to the non-moving party in determining if a genuine issue of material fact exists. *Kunz v. United Food & Commercial Workers, Local 876,* 5 F.3d 1006, 1008–09 (6th Cir.1993). The standard is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)).

## Discussion

Defendants seek summary judgment pursuant to the express preemption clause of the Medical Device Amendments ("MDA") of the Federal Food, Drug, and Cosmetic Act (the "Act"), 21 U.S.C. § 360k(a).[2] The amendments to the Act are codified at 21

---

**1.** As discussed in detail below, this distinction is of critical significance. By the time plaintiff received his prosthesis in 1987, the implantation of the PCA Knee for use with bone cement had long been approved by the Food and Drug Administration ("FDA"), whereas the cementless application was still subject to scientific investigation.

**2.** Unless otherwise noted, all subsequent statutory citations are to the Act and its amendments at Title 21, United States Code.

U.S.C. § 360c, *et seq.* The Act and its amendments, including the MDA, require the Food and Drug Administration ("FDA") to regulate the development, marketing, and monitoring of medical devices, such as the PCA Knee. By enacting the MDA, Congress sought to balance the need for safety and effectiveness of medical devices against "allowing new and *improved* devices to be marketed expeditiously without the costs attributable to an excess of regulation." *Mendes v. Medtronic, Inc.,* 18 F.3d 13, 14 (1st Cir. 1994) (citation omitted and emphasis added). Consequently, the MDA limits entities other than the FDA from imposing requirements on the makers of medical devices and the process by which those devices are discovered, investigated, manufactured, packaged, and sold. *See* § 360k(a); *see also Gile v. Optical Radiation Corp.,* 22 F.3d 540, 541 (3d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994).

■ Section 360k(a), the preemption clause of the MDA, provides in part as follows:

[N]o state or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

Plaintiffs argue that the MDA does not preempt state law tort claims regarding medical devices. They rely principally on a re-

cent case which holds that the MDA does not preempt tort claims arising out of injuries caused by an allegedly defective prosthetic knee device. *Mulligan v. Pfizer Inc.,* 850 F.Supp. 633 (S.D.Ohio 1994).[3] I am of the opinion, however, that the *Mulligan* court's analysis of preemption under the MDA is flawed.[4] Indeed, all of the courts of appeal that have considered the issue since the Supreme Court's decision in *Cipollone* have held that the MDA preempts state tort claims for damages where the medical devices at issue were Class III devices or had been granted an Investigational Device Exemption ("IDE") by the FDA. *See, e.g., Mendes,* 18 F.3d at 18; *Gile,* 22 F.3d at 541; *Duncan v. Iolab Corp.,* 12 F.3d 194, 195 (11th Cir.1994); *Slater v. Optical Radiation Corp.,* 961 F.2d 1330, 1332 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992); *King,* 983 F.2d at 1134.

Likewise, the vast majority of federal district court decisions since *Cipollone* have held that the MDA preempts state law tort claims under similar circumstances. *See, e.g., Michael v. Shiley, Inc.,* 1994 WL 59349, 1994 U.S.Dist. LEXIS 1973 (E.D.Penn. Feb. 25, 1994); *Bravman v. Baxter Healthcare Corp.,* 842 F.Supp. 747 (S.D.N.Y.1994); *Griffin v. Medtronic, Inc.,* 840 F.Supp. 396 (D.Md.1994).

*Cipollone* involved the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. §§ 1331–1340, which, like the MDA, prohibits states from imposing "requirements" with respect to the subject matter of the preemption provision. — U.S. at ——, ——, 112 S.Ct. at 2613, 2617. Considering the issue of whether the act involved in *Cipollone*

---

3. It is not clear from the opinion whether or not the prosthetic knee device at issue in *Mulligan* was a Class II or Class III device, or a device subject to an investigational device exemption. These classifications are discussed below.

4. Specifically, I am unpersuaded by the *Mulligan* court's conclusion that § 360k does not apply to state products liability statutes that do not pertain to a specific device. The *Mulligan* court reasoned that products liability statutes affect *all* products, not just medical devices, and thus are not preempted under the MDA. 850 F.Supp. at 635–36. But this analysis ignores the import of *Cipollone v. Liggett Group, Inc.,* — U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), which,

as discussed below, clearly places court decisions and thus the common law within the rubric of "state regulation" as contemplated by preemption statutes. Furthermore, the *Mulligan* court failed to consider 21 C.F.R. § 808.1(b), in analyzing the FDA's interpretation of the preemption statute. Numerous courts have cited § 808.1(b) in reaching the conclusion that a "state requirement" as contemplated in § 360k "may emanate from any requirement established by a state including ... court decisions." *See, e.g., King v. Collagen Corp.,* 983 F.2d 1130, 1134 (1st Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993).

preempted common law actions, the Court stated:

> The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; ... Those words easily encompass obligations that take the form of common law rules. As we noted in another context, "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."

—— U.S. at ——, 112 S.Ct. at 2620 (quoting *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959)).

Because § 360k of the MDA expressly preempts state regulation through the establishment of any "requirement" that is different from, or in addition to, the requirements of the MDA, or which relates to the safety or effectiveness of the device over which the MDA has plenary jurisdiction, it represents "maximum protection and express preemption," rendering any implied preemption analysis inapposite. *King,* 983 F.2d at 1139. Thus, plaintiffs' reliance on implied preemption cases and the analysis set forth therein is misplaced under the facts of this case.

Moreover, the FDA has interpreted § 360k consistently with this approach in its regulations, 21 C.F.R. § 808.1(b). Read in its entirety, this section prohibits, not supports as plaintiffs argue, "challenges ... to investigational devices under the guise of product liability actions...." *Gile,* 22 F.3d at 544. The FDA has determined, in accordance with *Cipollone,* that the word "requirement" as used in § 360k includes court decisions. 21 C.F.R. § 808.1(b). Insofar as this agency interpretation is based on a reasonable construction of the statute, it is controlling. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).[5]

Yet even though it now appears settled that the MDA can and often does preempt state product liability claims, this does not end the inquiry. The language of § 360k clearly indicates that state law claims are not preempted *unless* they could or do supplant any statutory or regulatory requirement applicable to or related to the safety or effectiveness of a particular medical device. Consequently, the extent of FDA regulation must be considered in determining whether a state tort law claim is preempted under the facts of a given case. *See, e.g., Gile,* 22 F.3d at 544–45.

The analysis begins by considering the statutory classifications into which medical devices are placed. All such devices are ultimately placed into one of three categories, depending on the degree of risk of illness or injury arising from the unregulated use of any particular device. § 360c(a)(1). All three classes are subject to "general controls," including labeling requirements and good manufacturing practices. *See, e.g.,* §§ 360i, 360j. Class I devices are those devices which are deemed to pose little risk to public health or safety, or those for which the general controls on manufacturing practices are considered sufficient to provide reasonable assurance of safety and effectiveness of the device. § 360c(a)(1)(A). Class II devices pose a greater risk to health, warranting, in some cases, special controls such as post-market surveillance, patient registries, performance standards and other guidelines. § 360c(a)(1)(B). Class III devices, as the PCA implant used without cement now is, pose the greatest risks. They are generally required to undergo a thorough premarket approval process before introduction. § 360c(a)(1)(C). Thus, these devices may be sold only if the FDA grants premarket approval. §§ 360c(a)(1)(C), 360e(b); 21 C.F.R. § 807.100. An important exception to this general rule exists for experimental devices undergoing scientific investigation. § 360j(g).

When introduced in 1981, the PCA Knee was a Class II device labeled for use with

---

5. Plaintiffs' reliance on 21 C.F.R. § 808.1(d) is thus misplaced. Although this section enumerates examples of state or local requirements that are not preempted by § 360k, it is significant that the list does not include state tort or common law claims.

bone cement only. The FDA viewed the product, used with cement, as "substantially equivalent" to devices already on the market at the time the MDA was enacted in 1976. The PCA knee implant labeled for use with bone cement has specifically been held to be subject to state products liability law. *See Elbert v. Howmedica, Inc.,* 841 F.Supp. 327, 331–32 (D.Haw.1993). The *Elbert* court in a well-reasoned opinion stated:

> The regulations concerning the PCA knee system at issue, *a Class II device,* are intended for identification purposes only. (Citations omitted and emphasis added). As such, no requirements are imposed on the PCA knee that was implanted in plaintiff's leg which would preempt state tort claims.

> \*      \*      \*      \*      \*      \*

> The FDA, by ... not promulgating specific regulations pertaining to *design* and *construction* [for Class II knee implants], has provided that state law claims of defective design, composition, and construction are outside the preemptive scope of [the FDA regulations].

*Id.* at 331 (emphasis in original). However, the court made an important distinction, contrasting the implant at issue there with the PCA Knee labeled for use without bone cement as was used in this case. The *Elbert* court stated that "the Class II, cemented version of the PCA knee ... [is] subject to functionally different stress dynamics than the 'approved' Class III non-cemented device. In denying summary judgment, this court found that the devices could not be equated for the purposes of preemption." *Id.* at 332. Plaintiffs' reliance on *Elbert,* then, is misplaced.

■ When it was implanted without bone cement in Mr. Dawson's leg, the PCA Knee was neither a Class II nor as yet a Class III device.[6] Rather, it was classified as "investigational." The MDA exempts investigational devices from the usual requirements relating to safety and effectiveness of a medical device before it can be sold. *See* 21 C.F.R. § 812.1(a) (Investigational devices are ex-

empted from, among other MDA requirements, the premarket approval process for Class III devices); *Slater,* 961 F.2d at 1331–32. Such exemptions are provided to encourage innovation and experimentation in those situations in which extraordinary medical remedies are warranted. § 360j(g). Not surprisingly, therefore, a detailed application is required to receive an investigational device exemption ("IDE"). 21 C.F.R. § 813.20; *Slater,* 961 F.2d at 1332. The application must describe the device and set forth a plan for studying its use in human subjects during the experimental period. 21 C.F.R. § 813.20. The recipients of a device granted an IDE are informed of the device's investigational status and the risks involved. § 360j(g)(3)(D); 21 C.F.R. § 813.66(a)(6). An institutional review committee monitors clinical investigations instituted pursuant to the application process. 21 C.F.R. § 813.65.

The procedure followed by Howmedica in obtaining the IDE for the PCA Knee fully complied with this process. On July 9, 1981, Howmedica sought FDA authorization to conduct a clinical study and investigation of the cementless use of the PCA Knee. [*See* Doc. No. 19, Affidavit of Robert Smith, at 3]. Section 4.1 of Howmedica's IDE application reveals that the purpose of the investigation was to determine the safety and effectiveness of the PCA Knee in patients undergoing noncemented total knee joint replacement. [*See* Doc. No. 33, Supplemental Affidavit of Robert Smith, at 5]. The IDE application also contrasts the risks and benefits of the cementless and cemented applications of the PCA Knee. [*Id.*]. The investigation plan proposed by Howmedica even anticipated medical complications resulting specifically from non-cemented use and thus envisioned possible design changes. [*Id.,* at 6].

The FDA also required certain other information, including a description of the device and a protocol or plan for clinical investigators, a list of proposed investigators, and proposed informed consents. [*See* Doc. No. 19, Affidavit of Robert Smith, at 3]. The FDA granted conditional approval of the IDE for the PCA Knee on January 13, 1982,

---

6. The parties do not dispute that the FDA did not give final Class III approval for the PCA Knee

until September 30, 1988, over one year after the device was implanted in Mr. Dawson's leg.

but requested additional information. [*Id.,* Ex. B]. This was provided and on March 18, 1982, the FDA granted the IDE and authorized the clinical investigation to begin.

Following this clinical investigation, Howmedica filed a premarket approval application ("PMAA") on October 5, 1984 to market and label the PCA Knee for cementless use. The purpose of the PMAA procedure is to "provide a reasonable assurance of ... safety and effectiveness. . . ." § 360c(a)(1)(C). The procedure required Howmedica to submit safety and effectiveness testing data and descriptions of manufacturing materials and methods. [*See* Doc. No. 19, Affidavit of Robert Smith, at 4]. The process also required Howmedica to provide a description of the device, including its components, ingredients, properties, principles of operation, and the methods used in the manufacture, storage, processing, packing, installation and quality control of the device. [*Id.*]. The clinical investigation results gathered during the investigational stage were also required to be submitted. [*Id.*].

Plaintiffs do not discuss the fact that the PCA Knee was subjected to these stringent requirements by the FDA before it received an IDE and Class III approval. Rather, plaintiffs incorrectly categorize the prosthesis as a Class II device. However, as the *Elbert* court recognized, it is the presence (or absence) of requirements related to safety and effectiveness that must be considered in the preemption analysis under the MDA, not mere classifications alone. 841 F.Supp. at 331–32. Because the prosthesis in *Elbert* was a Class II device, not having completed the procedural requirements for either an IDE or Class III designation, the plaintiff's state tort claims were not preempted. *Id.* By contrast, it is undisputed here that the IDE remained in effect until Howmedica received premarket approval for the PCA Knee as a Class III device for cementless use in 1988. It is also undisputed that Mr. Dawson received his PCA Knee implant without the use of cement in 1987, while the IDE was in effect.

All of the courts of appeal that have published opinions involving investigational medical devices have found preemption in this context. *See, e.g., Gile,* 22 F.3d at 541; *Slater,* 961 F.2d at 1332.[7] In *Slater,* the plaintiff brought state tort claims of negligence, strict liability and breach of implied warranty against the manufacturer of an investigational device that been implanted and later removed because of alleged injury-causing defects. Responding to the argument that defective design claims are not preempted unless the FDA promulgates specific substantive requirements concerning the design of the device at issue, Judge Posner stated:

> The argument assumes that the only federal requirement that might relate to the safety or effectiveness of the design of a medical device would be an actual specification of that design. The preemption provision does not say this, and so cramped an interpretation would cripple the exemption for investigational devices. The FDA can hardly be expected to specify the safe and effective design of a device when it is still experimental. If there were a known safe and effective design, the device would no longer be experimental. The point of the experiment is to find out whether it is safe and effective. (Citation omitted). In the experimental phase the appropriate regulations of safety and effectiveness are procedural rather than substantive ones. They do not specify the safe and effective design; they specify the procedures for determining whether the experimental design is safe and effective. These are requirements relating to safety and effectiveness and they can therefore have preemptive effect.

*Slater,* 961 F.2d at 1333.

Clearly then, it is the extent of congressional and FDA regulation related to such considerations that must guide preemption analysis under the MDA.[8] In view of

---

**7.** Both *Gile* and *Slater* discussed the preemption of state tort claims for defective intraocular lenses, which are surgically implanted to replace the natural lens of the human eye following removal of cataracts. *Id.*

**8.** The fact that plaintiff's surgeon, Dr. McMahon, was not an authorized clinical investigator, but rather in his medical judgment engaged in a legal "off-label" use of the device for cementless implant during the IDE period, does not change

Howmedica's intermediate compliance with the MDA's procedures related to safety and effectiveness, I conclude that the IDE requirements when applied under the facts of this case preempt plaintiffs' state product liability claims. The FDA granted, as it was charged by Congress to do, an IDE believing that the PCA Knee had sufficient promise of being proved safe and effective to justify the risk of its being used on human beings. *Cf. Slater*, 961 F.2d at 1333. Thus, plaintiffs' design defect claim must yield under the supremacy of federal law. Similarly, plaintiffs' claims of a manufacturing defect and breach of implied and express warranty are preempted. *See King*, 983 F.2d at 1135–36. As noted above, detailed manufacturing, quality control, and packing and labeling procedures are part of the information required to be submitted with the IDE application or accompanied with the PCA Knee implant. *See Gile*, 22 F.3d at 544; *Slater*, 961 F.2d at 1332. If a judgment were awarded on the basis of defective design or that Howmedica should have implemented different or additional manufacturing, quality control, packaging, or labeling procedures, then state requirements would be established that differed from or added to the applicable federal requirements under the MDA. Such requirements would subject experimental procedures "to hindsight evaluation by juries, so that failed experiments threaten to impose enormous tort liability on the experimenter, [resulting in] fewer experimental treatments, [while] patients ... suffer." *Slater*, 961 F.2d at 1334.

Therefore, for the reasons stated, plaintiffs' claims are preempted and this case must be dismissed.

Order accordingly.

the analysis. Dr. McMahon's use of the device is not the focus. Rather, the focus must be upon the extensive federal requirements to which the PCA Knee had been subjected and the fact that plaintiffs' claims would establish state requirements different from or in addition to those extensive federal requirements. To focus on Dr. McMahon's use of the experimental device would improperly inject the manufacturer into a potential dispute between doctor and patient. *Cf. Gile*, 22 F.3d at 543 (claims based on lack of informed consent are not exempt from preemption, but are properly brought only as between physician and patient); *accord Slater*, 961 F.2d at 1334.